**CHARLEY'S TAXI RADIO DISPATCH CORPORATION, Plaintiff,**

v.

**SIDA OF HAWAII, INC., et al., Defendants.**

**Civ. No. 79–0383.**

United States District Court, D. Hawaii.

April 1, 1983.

Tany S. Hong, Atty. Gen., State of Hawaii, Gerald Y.Y. Chang, Deputy Atty. Gen., Honolulu, Hawaii, for State defendants.

Robert S. Katz, Terrence M. Lee, Torkildson, Katz, Jossem & Loden, Honolulu, Hawaii, for SIDA of Hawaii, Inc.

Khourie & Crew, Eugene C. Crew, Daniel J. Furniss, Joel Linzer, San Francisco, Cal., Abe & Abe, Kazuhisa Abe, Arnold T. Abe, Honolulu, Hawaii, for plaintiff.

## OPINION and ORDER

JAMES M. BURNS, Chief Judge:

### INTRODUCTION

The economies of the State of Hawaii and of her citizens are more dependent on the airplane than are those of any other state in the Union.[1] As an island people with tourism as their major source of income,[2] Hawaiians focus great attention on their airport and its ancillary services. Many of these services, including car rental, tour bus, currency and photographic greeting services, have been or currently are involved in anti-trust litigation.[3] Unlike

---

1. Horvat, *Above the Pacific* (1966)

2. *The State of Hawaii Data Book* (1981). In 1980 tourism brought $3.0 billion to Hawaii. Defense spending, Hawaii's second source of outside income, generated $1.3 billion in 1980.

3. The car rental litigation is on-going. *Pacific Auto Rental Corp. dba Dollar Rent-A-Car Systems v. State of Hawaii et al.,* Civ.No. 79–0146 (D.Haw.) was filed on March 30, 1979, and on July 23, 1979 was transferred to the Northern District of California to be made a part of the multi-district litigation. In March 1978 the Judicial Panel on Multi-district Litigation centralized in that district six cases pending in five districts charging major car rental companies with violation of the antitrust laws. *In re Airport Car Rental Antitrust Litigation,* 448

most airports Honolulu International Airport (HIA) is state owned [4] and its contracts for airport services are, with the exception of lei stands, exclusive.[5]

The subject of this case is a fifteen-year contract between defendants State of Hawaii and SIDA, an association of independent taxicab owner-operators, by which SIDA acquired the exclusive right to provide metered taxicab service to deplaning passengers at both terminals of HIA (International and inter-island terminals). Plaintiff (Charley's) is a Hawaii corporation whose drivers are licensed by the City and County of Honolulu to provide metered taxicab service. Plaintiff alleges that the exclusive contract between the defendants violates sections one and two of the Sherman Act (15 U.S.C. §§ 1, 2); it has moved for partial summary judgment on the issues of 1) the legality of the SIDA/State contract and 2) the availability to the defendants of the so-called state action immunity defense. Both defendants SIDA and the state defendants (the State of Hawaii and the State Department of Transportation) [6]

have moved for summary judgment contending they are exempt from federal antitrust laws under the *Parker* doctrine. *Parker v. Brown,* 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943).

Because plaintiff has failed to show that no genuine issues of material fact remain to be determined, I deny its motion for partial summary judgment on the legality of the SIDA-State contract. This motion involves canvassing the issues of what constitutes a group boycott and whether one exists in this case; whether SIDA's composition and the nature of its activities constitute a horizontal restraint of trade; whether a *per se* rule or "rule of reason" should be used in this case; what constitutes the relevant market in this case; whether SIDA possesses monopoly power; whether that power—if it exists—was acquired or maintained wilfully; and whether plaintiff has suffered injury cognizable under the Sherman Act. The question of whether the contract between SIDA and the state unlawfully restrains and monopo-

F.Supp. 273 (J.Pan.M.L.1978). Currently the cases are awaiting the outcome of a petition for certiorari following the Ninth Circuit's affirmance of Judge Schwarzer's granting of a motion for summary judgment for defendants against one plaintiff. *In Re Airport Car Rental Antitrust Litigation,* 521 F.Supp. 568 (N.D.Cal.1981) aff'd, 693 F.2d 84 (9th Cir.1982). These rulings involved the *Noerr-Pennington* exemption from antitrust law rather than state action immunity. This applies to lobbying and other attempts to influence official government action. *See United Mine Workers v. Pennington,* 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965); *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.,* 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 465 (1961).

The tour bus case is a part of this litigation; *Charley's Taxi* was consolidated on August 10, 1981 with *Charley's Tour & Transportation, Inc. dba Charley's Scenic Tours v. Interisland Resorts Ltd. et al,* Civ. No. 80–0060 (D.Haw.) filed February 5, 1980. It is likely that the two cases will be deconsolidated, at least for trial purposes.

The currency concession was at issue in *Deak-Perera Hawaii, Inc. v. Department of Transportation,* 553 F.Supp. 976 (D.Haw.1983), in which Judge Pence granted defendants' motion for summary judgment on the basis of *Parker. Parker v. Brown,* 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943). *See* text, *infra* at 716–717. Photographic greeting services

were at issue in *Leia, Inc. v. Photo Management et al.,* Civ.No. 78–0263 (D.Haw. March 18, 1982). In an opinion filed February 4, 1980 Judge Weigel denied the defendants' motion for summary judgment on the grounds of state action "immunity", finding that defendants could not pass the *Midcal* test. *California Retail Liquor Dealers Association v. Midcal Aluminum, Inc.,* 445 U.S. 97, 100 S.Ct. 937, 63 L.Ed. 233 (1980). *See* text, *infra* at 716, 717, 719, 723. *Leia* was dismissed for lack of prosecution in March 1982.

4. Only in Hawaii, Alaska and Rhode Island are airports owned and operated by the state. *Membership Directory,* Airport Operators Council International (1983).

5. Defendant State of Hawaii's memorandum in opposition to plaintiff's motion for partial summary judgment at 8; *Deak-Perera* at 978.

6. Plaintiffs originally had filed suit against the Hawaii Department of Land and Natural Resources and Messrs. S. Ono, M. Kealoha, S. Hong, R. Higashi, T. Yagi and T. Yamamoto in their capacities as members of the Board of Land and Natural Resources and against Dr. R. Higashionna as Director of Transportation. By stipulation the case against these state defendants was dropped on March 25, 1983.

lizes trade is the "meat of the coconut"; neither side has yet sufficiently honed the issues of which it is composed. Summary judgment should be used but sparingly in antitrust litigation. *Poller v. Columbia Broadcasting Systems Inc.*, 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962); *General Business Systems v. North America Phillips Corp.*, 699 F.2d 965 at 971 (9th Cir.1983). On the current state of the record the question of the legality of the contract cannot be adequately dealt with by way of a summary judgment motion. The time may come when such a motion is apposite. However, I decline to find that this case now presents one of those infrequent situations where summary judgment on the central issue is appropriate in an anti-trust case.

I grant plaintiff's, and therefore deny defendants', motion for partial summary judgment on the issue of the availability to defendants of the state action immunity defense. Defendants have failed to show that their conduct is beyond the reach of the federal antitrust laws pursuant to the state action doctrine of *Parker v. Brown*.

## STATEMENT OF FACTS

In 1978 defendants State of Hawaii and SIDA of Hawaii entered into a fifteen-year contract whereby SIDA was granted the exclusive right to provide metered taxicab service at HIA's two terminals. SIDA had first received this contract in 1963. It had been renewed every two years until 1973 when SIDA's contract was renewed for five years. In 1974 plaintiff was awarded the contract to provide metered taxicab service at HIA's inter-island terminal, a substantially less lucrative market than the international terminal.[7] The contract was scheduled to run until the end of 1978 but was terminated by the state in 1977 for payment default.

The contract awards SIDA "the exclusive privilege of soliciting passengers for and providing metered taxicab services to such passengers at the domestic and foreign arrivals area, Honolulu International Airport...". No other taxicab company or independent taxi driver unaffiliated with SIDA may solicit passengers at HIA or provide taxi service if hailed, unless the passenger has pre-arranged for this service. "Pre-arranged" taxi service refers to service either arranged by the passenger before leaving her mainland or foreign port of departure or service arranged by a deplaning passenger at HIA who telephones to taxi companies located in Honolulu. Absent such a "pre-arrangement" only SIDA may serve deplaning passengers. It is undisputed that the "pre-arranged" taxi market is negligible; Mr. Miyamoto, Chief of

---

**7.** Defendants in this case have not asserted, and are unlikely to assert, the defense of *in pari delicto* against Charley's on the basis of this inter-island contract. The doctrine was severely limited, if not dealt a fatal blow, by the Supreme Court in *Perma Life Mufflers Inc. v. International Parts Corp.*, 392 U.S. 134, 88 S.Ct. 1981, 20 L.Ed.2d 982 (1968).

The Ninth Circuit has, on several occasions, asserted the doctrine's demise, *see, e.g., Royal Printing Co. v. Kimberly-Clark Corp.*, 621 F.2d 323, 326 n. 5 (9th Cir.1980); *Calnetics Corp. v. Volkswagen of America, Inc.*, 532 F.2d 674, 688–90 (9th Cir.1976), and has held that for public policy reasons the illegal conduct of an antitrust plaintiff does not completely and automatically bar his claim. *First Beverages, Inc. of Las Vegas v. Royal Crown Cola Co.*, 612 F.2d 1164, 1174–75 (9th Cir.1980); *Memorex Corp. v. International Business Machines Corp.*, 555 F.2d 1379, 1380–82 (9th Cir.1977).

In *Thi-Hawaii v. First Commerce Financial Corp.*, 627 F.2d 991 (9th Cir.1980), its latest statement on the status of the *in pari delicto* defense, the Ninth Circuit recognized that the defense still exists to the extent of barring recovery by a plaintiff who is "truly complete[ly] involve[d] and participat[ing]" in the illegal activity. *Perma Life*, 392 U.S. at 140, 88 S.Ct. at 1985. The Ninth Circuit has adopted the "but for" test in determining whether a plaintiff's participation in the monopoly is so complete as to give the defendant an *in pari delicto* defense. By this test a "plaintiff's recovery is not barred unless the illegal conspiracy would not have been formed but for its participation. *See Javelin Corp. v. Uniroyal, Inc.*, 546 F.2d 276, 279 (9th Cir.1976)." *Thi-Hawaii* 627 F.2d at 995.

In this circuit, therefore, a defense of *in pari delicto* can apparently only be successfully asserted against an antitrust plaintiff who was an original and meaningful participant in the monopolistic or conspiratorial conduct. A latecomer like Charley's is likely to be safe from such a defense.

Airports Division of defendant DOT characterized the number of HIA passengers who "pre-arrange" taxi service as "very few if any" (Miyamoto Dep. at 90.) Taxicabs other than SIDA's may take passengers to HIA from Honolulu; in fact they are required to do so by city ordinance that mandates the acceptance of all lawful fares.[8] However, they cannot accept paying passengers for their return trip to Honolulu, thus forcing them to "deadhead" back to the city, even if there are deplaning HIA passengers in need of taxi service.

## DISCUSSION

The state defendants and SIDA contend that their conduct in entering into an exclusive contract, if anticompetitive, is exempted from federal antitrust legislation under the state action doctrine first enunciated in *Parker v. Brown,* 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943).[9] The state defendants assert that their mere status as the state and a state department gives them "immunity". SIDA acknowledges that for its conduct to be shielded from application of federal antitrust laws the conduct must pass the two-part *Midcal* test which requires that the conduct be pursuant to a clearly articulated and affirmatively expressed state policy to displace competition and that it be actively supervised by the state itself. *California Retail Liquor Dealers Association v. Midcal Aluminum, Inc.,* 445 U.S. 97, 100 S.Ct. 937, 63 L.Ed.2d 233 (1980). SIDA argues that its conduct passes this test. Plaintiff contends that the conduct of all defendants must be judged by the *Midcal* test and that the challenged conduct fails to meet that test and is therefore subject to federal antitrust laws.

 I agree with the state defendants that an exemption from antitrust law, without resort to the *Midcal* test, for the type of state conduct at issue here would be a wiser policy and would be a truer reading of *Parker* if *Parker* is read absent intervening Supreme Court and Ninth Circuit cases. The wisdom of recognizing state sovereignty in this situation is shown in Judge Pence's opinion in *Deak-Perera Hawaii, Inc. v. Department of Transportation State of Hawaii,* 553 F.Supp. 976 (D.Haw.1983) which involved the currency concession at HIA. Despite the substantial deference I pay to the ruling of Judge Pence,[10] neither

---

**8.** (c) Responding to Calls.

The operator of a taxicab stand shall not refuse to furnish unengaged, available taxicab and driver during the business hours of such stand upon call or request from an orderly person located within one mile of such stand, by the most direct street route. No taxicab driver, while on duty and not engaged in another call, shall fail to drive an available taxicab in response to a call or request from an orderly person.
Revised Ordinance of Honolulu § 12–1.5(c) (1978)

**9.** Although most cases and commentators refer to *Parker* as the source of the state action doctrine, Judge Pence in *Deak-Perera* points out that this is actually a misconception; the doctrine always existed as part of the theory of federalism in which it is grounded. *Deak-Perera* at 980.

**10.** My deference to Judge Pence's ruling is all the greater because I am a visiting judge designated only temporarily to Judge Pence's district. By tradition and comity a judge in a multiple-judge district follows the prior decision of a brother judge upon the same question. *Buna v. Pacific Far East Line, Inc.,* 441 F.Supp. 1360 (N.D.Cal.1977); *In Re Carmona,* 224

F.Supp. 497 (S.D.Cal.1963); *Rojas-Gutierrez v. Hoy,* 161 F.Supp. 448 (S.D.Cal.1958). Even without my ruling in this case, however, there was not complete unanimity in the District of Hawaii on the state action exemption issue; Judge Weigel in *Leia,* ruled as I have, that *Midcal* applies to the state defendants and that they have not demonstrated sufficient articulation and supervision, whereas Judge Pence found that *Midcal* did not apply to the same state defendants.

Comity and tradition do not bind when a judge has a cogent reason or reasons for diverging from the ruling of his brother or brethren. *Id.* In this case I believe I have such a cogent reason. My reading of controlling Supreme Court and Ninth Circuit cases requires me to differ from the prior ruling of Judge Pence. I note that the state action question will not be the first break with judicial comity in this complex series of airport antitrust cases. In granting defendant's motions for summary judgment on the *Noerr-Pennington* question, Judge Schwarzer reconsidered and reversed the earlier ruling by Judge Renfrew on the same question in the same consolidated cases, albeit the motions were directed against a different plaintiff. *In Re Airport Car Rental Antitrust*

stare decisis nor judicial comity requires me to follow it. *Starbuck v. City & County of San Francisco,* 556 F.2d 450, 457 n. 13 (9th Cir.1977); *In Re Brents-Pickell,* 12 B.R. 352, 357 (Bkrtcy.S.D.Cal.1981). Neither may my decision in this case be based on my opinion of the best policy. I must instead adhere to what seems to me to be the compulsion of the Supreme Court's post-*Parker* state action cases and to the even clearer command of recent Ninth Circuit cases on the issue. This circuit has consistently, and recently, held that the *Midcal* test is to be used in deciding whether either a state agency or a private individual may be granted "immunity" from federal antitrust law. *Miller v. Oregon Liquor Control Commission,* 688 F.2d 1222 (9th Cir.1982); *Ronwin v. State Bar of Arizona,* 686 F.2d 692 (9th Cir.1982); *Knudsen Corp. v. Nevada State Dairy Commission,* 676 F.2d 374 (9th Cir.1982); *Benson v. Arizona State Board of Dental Examiners,* 673 F.2d 272 (9th Cir.1982); *Turf Paradise Inc., v. Arizona Downs,* 670 F.2d 813 (9th Cir.1982). Using this test, I cannot find either the state defendants or SIDA exempt from the reach of the Sherman Act.

*The Midcal Test Applies to State Defendants*

The basis of the Supreme Court's decision in *Parker* was that federal antitrust law had not preempted state sovereignty; California could decide to dispense with competition in the marketing of raisins and institute a system of state regulation without running afoul of the Sherman Act. The Court analyzed Congressional intent and found "nothing in the language of the Sher-

man Act or in its history which suggests that its purpose was to restrain a state or its officers or agents from activities directed by its legislature." *Parker v. Brown,* 317 U.S. at 350–51, 63 S.Ct. at 313.

■ For thirty years the Supreme Court was silent on the applicability of federal antitrust law to actions of the states. Then in a spate of decisions commencing with *Goldfarb v. Virginia State Bar,* 421 U.S. 773, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975) the Court developed what is now referred to as the *Midcal* test.[11] The rationale for the test is that competition, the "raison d'etre" of the Sherman Act, may be replaced with state regulation where the state has taken a positive and clearly enunciated stand to do so. *Parker* declared that a state could not legitimize otherwise illegal anticompetitive activity merely by authorizing it; there had to be a state policy to replace the forces of the marketplace with the benefits of state regulation. Thus the *Midcal* test requires that for conduct to be exempt first it must be based upon a state policy to displace competition that is "clearly articulated and affirmatively expressed" and second, the conduct must be "actively supervised" by the state itself. *Midcal* 445 U.S. at 105, 100 S.Ct. at 943. Clear articulation with active supervision show that the state is not merely acquiescing in the anticompetitive activity of others, but is truly involved in replacing competition with adequate state regulation.

The state defendants argue that the *Midcal* test was not intended to be applied to

*Litigation,* 521 F.Supp. 568 (N.D.Cal.1981); 474 F.Supp. 1072 (N.D.Cal.1979).

Further, there is one important difference between *Deak-Perera* and *Charley's* in terms of the statutory authorization upon which state defendants rely. The currency concession in *Deak-Perera* is covered by chapter 102 of the Hawaii Revised Statutes which mandates competitive bidding. This bespeaks greater articulation of a state policy to displace competition than does the indeterminate grant of authority embodied in chapter 261, which applies to the taxi issue.

11. As the Court developed this test it also came to refer to the non-applicability of federal anti-

trust law to the states as an "immunity" for the states. This may well be a misnomer. *Parker* applied standard state sovereignty/federal preemption analysis in the context of antitrust law; it did not create an exception or immunity for states. *See Community Communications Co. v. City of Boulder,* 455 U.S. 40, 60, 102 S.Ct. 835, 845, 70 L.Ed.2d 810 (1982) (Rehnquist, J., dissenting); M. Handler, *Reforming the Antitrust Laws,* 82 Colum.L.Rev. 1287, 1330 (1982). Perhaps the present confusion in this area stems from the readiness with which we attach labels to concepts, which subsequently give rise to legal consequences, frequently not intended or contemplated by the labeler.

the state as an antitrust defendant. However persuasive their argument may be from a policy standpoint, it is not the law of this circuit. Nor is it a wholly accurate portrayal of Supreme Court cases.[12] Although the State of California was not the named defendant in *Midcal,* the state had been the defendant in the case below, had chosen not to appeal the adverse state court decision, but was permitted to appear as amicus curiae in the Supreme Court. The retail liquor dealers association, an intervenor below, took it upon itself to try to vindicate the state's interest in its resale price maintenance scheme for wine. Although it preceded *Midcal, New Motor Vehicle Board v. Orrin Fox Co.,* 439 U.S. 96, 99 S.Ct. 403, 58 L.Ed.2d 361 (1978) also involved a California state agency defending its conduct from antitrust attack. In that case the Court found that the anticompetitive conduct passed the precursor to the *Midcal* test.

▪ This circuit has applied the *Midcal* test to a state bar, (*Ronwin v. State Bar of Arizona*) to state commissions (*Miller v. Oregon Liquor Control Commission* and *Knudsen v. Nevada State Dairy Commission*) and to a state board (*Benson v. Arizona State Board of Dental Examiners*); it has done so in areas, such as the licensing of professionals, that have historically been regarded as uniquely the province of the states themselves. Since *Ronwin* there can be no doubt that even where the state has authorized or participated in the challenged anticompetitive activity, that activity must be required by a clearly articulated and affirmatively expressed state policy to displace competition with active state supervision for the state action exemption to apply:

The fact that the Committee was established by Supreme Court Rule and composed of members selected from the Bar by the Arizona Supreme Court is not, as defendants assert, dispositive in itself of the state-action question. Although the defendants in the United States Supreme Court's state-action decisions were public bodies, or subdivisions of the state, that did not end the Court's analysis. The Court still looked to see whether the challenged restraints were clearly articulated and affirmatively expressed as state policy and were actively supervised by the state acting as sovereign. Thus, for instance, it was not dispositive that the restraints challenged in *Parker, Orrin W. Fox,* and *Midcal* were enforced, respectively, by a state commission, a state board, and a state department. (Citations omitted) In *City of Lafayette,* 435 U.S. at 408, 98 S.Ct. at 1134, a plurality of the Court expressly rejected the argument that the state-action exemption extends to "all governmental entities, whether state agencies or subdivisions of a State ... simply by reason of their status as such." This position has since been adopted by a majority of the Court. See *City of Boulder,* [455] U.S. at [53], 102 S.Ct. at 842 (1982).

*Ronwin v. State Bar of Arizona,* 686 F.2d at 697.

Although the state defendants, represented by the State Attorney General's Office, here assert that the *Midcal* test should not be applied to them, the Attorney General has previously recognized the applicability of *Midcal* to the operation of HIA.[13] In March 1981 the Antitrust Division of the Attorney General's office analyzed proposed legislation to create two duty-free conces-

---

12. In its most recent antitrust decision, *Jefferson County Pharmaceutical Association, Inc. v. Abbott Laboratories et al.,* —— U.S. ——, 103 S.Ct. 1011, 74 L.Ed.2d 882 (1983), the Court adheres to its policy of applying the federal antitrust laws to state and local governmental bodies. *City of Lafayette v. Louisiana Power and Light Co.,* 435 U.S. 389, 98 S.Ct. 1123, 55 L.Ed.2d 364 (1978) is cited in the opinion for the proposition that cities and states are persons within the ambit of the Sherman Act.

*Jefferson* continues the trend of non exemption for the states, at least in their proprietary capacities.

13. Application of the arcane analysis required by the *Parker* doctrine is surely not assisted merely because the Attorney General of Hawaii believes his legal shoulders are sufficiently broad for a bucket of water on both (or) on each one.

sions at HIA. In an opinion prepared for the House Committee on Transportation, the Division concluded that the legislation "failed to meet the two-tiered test set out in ... *Midcal* ..., a standard necessary to immunize state regulatory schemes which violate the federal antitrust laws from legal liability". (Opinion at 4).

**14.** Because the state defendants base their case on the nonapplicability of the *Midcal* test to them, they do not specifically assert that the facts of this case pass muster under the test. It is defendant SIDA who applies the test to the facts here. However, I will refer only to defendants, without specifying, as I will presume that the state defendants would assert that their challenged conduct did in fact pass the *Midcal* test were they to be aware that I now hold that the test applies to them.

**15.** The following sections of chapter 261 are pertinent here. Haw.Rev.Stat. § 261–4:

§ 261–4 *Airports, general.* (a) Establishment, operation, maintenance. The department of transportation may on behalf of and in the name of the State, out of appropriations and other moneys available or made available for such purposes, plan, acquire, and establish, construct, enlarge, and improve in the manner herein provided, maintain, equip, operate, regulate and protect airports and air navigation facilities, including the construction, installation, equipment, maintenance, and operation at airports of buildings and other facilities for the servicing of aircraft or for the comfort, accommodation, and convenience of air travelers, and including protection against airport hazards. For such purposes the department may, by purchase, gift, devise, lease, condemnation in accordance with chapter 101, or otherwise, acquire property, real or personal, or any interest therein, including the property, rights, estates, and interests mentioned in section 262–11. The department may acquire rights and interests in airports owned or controlled by others, for the purpose of meeting a civilian need which is within the scope of its functions, even though it does not have the exclusive control and operation of such airports. No officer, board or department of the State, or municipality, shall perform any function which is within the jurisdiction of the department without its approval, except for military purposes.

(b) Acquisition of real property. In the acquisition of real property and interests therein, the department of accounting and general services shall assist the department of transportation at its request, and assign thereto state officers and employees under its supervision for the making of surveys, abstracts, and otherwise as may be of assistance, for which services the department of transportation shall pay out of the appropriations available to it, unless

*Clear Articulation and Affirmative Expression*

■ Defendants[14] assert that the state has clearly articulated and affirmatively expressed its policy to displace competition in the provision of taxi service at HIA in chapter 261 of the Hawaii Revised Statutes.[15] I find no such clearly articulated

the department of accounting and general services has a general fund appropriation for such services.

(c) Structures and improvements. All structures and improvements to land shall be initiated by the department of transportation and shall be constructed or made by or under the comptroller, in conformity with plans and specifications approved by the department of transportation, for which purpose the department of transportation shall make allotments of the funds under its control for expenditure by the comptroller and for services of the department of accounting and general services for which the department has no general fund appropriation.

(d) Use of state and municipal facilities and services. In carrying out this chapter, the department of transportation may use the facilities and services of other agencies of the State and of the municipalities of the State to the utmost extent possible, and the agencies and municipalities shall make available their facilities and services. This subsection shall apply to the department of accounting and general services with respect to services and facilities in addition to those specified by subsections (b) and (c). [L 1947, c 32, pt. of § 1; RL 1955, § 15–9; am L Sp 1959 2d, c 1, §§ 12, 26] Haw.Rev.Stat. § 261–5:

§ 261–5 *Disposition of airport revenue fund.* (a) All moneys received by the department of transportation from rents, fees and other charges pursuant to this chapter as well as all aviation fuel taxes paid pursuant to section 243–4(a)(2) shall be paid into the airport revenue fund created by section 248–8. All such moneys paid into the airport revenue fund shall be expended by the department for the statewide systems of airports, including the construction of airports and air navigation facilities approved by the legislature, including acquisition of real property and interests therein; and for operation and maintenance of airports and air navigation facilities; and for the payment of indebtedness heretofore or hereafter incurred by the department, or its predecessor, the Hawaii aeronautics commission, for any of the purposes of this chapter. The department shall generate sufficient revenues from its airport properties to meet all of the expenditures of the statewide system of airports and to comply with section 39–59; provided that as long as sufficient revenues are

**720**

state policy, but rather a vague, unrestrained grant of authority to the Department of Transportation to run the airport as it chooses, bound only by the statutory

generated to meet such expenditures, the director of transportation may, in his discretion, grant a rebate of the aviation fuel taxes paid into the airport revenue fund during a fiscal year pursuant to sections 243–4(a)(2) and 248–8 to any person who has paid airport use charges or landing fees during such fiscal year. Such rebate may be granted during the next succeeding fiscal year but shall not exceed one-half cent per gallon per person, and shall be computed on the total number of gallons for which the tax was paid by such person, for such fiscal year.

(b) All expenditures by the department shall be made on vouchers duly approved by the director of transportation or such other officer as may be designated by the director. [L 1947, c 32, pt of § 1; RL 1955, § 15–10; am L SP 1959 2d, c 1, § 26; am L 1962, c 24, §§ 2, 3; HRS § 261–5; am L 1968, c 20, § 2; am L 1969, c 10, § 6 and c 99, § 1]

Haw.Rev.Stat. § 261–7:

§ 261–7 *Operation and use privileges.*

(a) Under department operation. In operating an airport or air navigation facility owned or controlled by the department of transportation, or in which it has a right or interest, the department may enter into contracts, leases, licenses, and other arrangements with any person:

(1) Granting the privilege of using or improving the airport or air navigation facility or any portion or facility thereof or space therein for commercial purposes;

(2) Conferring the privilege of supplying goods, commodities, things, services, or facilities at the airport or air navigation facility;

(3) Making available services, facilities, goods, commodities, or other things to be furnished by the department or its agents at the airport or air navigation facility; or

(4) Granting the use and occupancy on a temporary basis by license or otherwise any portion of the land under its jurisdiction which for the time being may not be required by the department so that it may put the area to common use and thereby derive revenue therefrom.

All the arrangements shall contain a clause that the land may be repossessed by the department when needed for aeronautics purposes upon giving the tenant temporarily occupying the same not less than thirty days' notice in writing of intention to repossess.

Except as otherwise provided in this section, in each case mentioned in paragraphs (1), (2), (3) and (4), the department may establish the terms and conditions of the contract, lease, license, or other arrangement, and may fix the charges, rentals or fees for the privileges, services, or things granted, conferred, or made available, for the purpose of meeting the expenditures of the statewide system of airports set forth in section 261–5(a), which includes expenditures for capital improvement projects approved by the legislature. Such charges shall be reasonable and uniform for the same class of privilege, service, or thing.

The department shall enter into separate contracts with no more than two persons ("contractors") for the sale and delivery of in-bond merchandise at Honolulu International Airport, in the manner provided by law. Each such contract shall confer the right to operate and maintain commercial facilities within the airport for the sale of in-bond merchandise and the right to deliver to the airport in-bond merchandise for sale to departing foreign-bound passengers.

The department shall grant such contracts pursuant to the laws of this State and may take into consideration:

(1) The payments to be made on in-bond merchandise sold at Honolulu International Airport and on in-bond merchandise displayed or sold elsewhere in the State and delivered to the airport;

(2) The ability of the applicant to comply with all federal and state rules and regulations concerning the sale and delivery of in-bond merchandise; and

(3) The reputation, experience, and financial capability of the applicant.

The department shall actively supervise the operation of the contractors to insure its effectiveness. The department shall develop and implement such guidelines as it may find necessary and proper to actively supervise the operations of such contractors, and shall include guidelines relating to the department's review of the reasonableness of contractors' price schedules, quality of merchandise, merchandise assortment, operations, and service to customers.

Apart from the contracts described above, during the period ending June 30, 1982, the department shall confer no right upon any person to offer to sell, or deliver in-bond merchandise at Honolulu International Airport.

(b) Under other operation. The department may, by contract, lease or other arrangement, upon a consideration fixed by it, grant to any qualified person the privilege of operating, as an agent of the State or otherwise, any airport owned or controlled by the department; provided that no such person shall be granted authority to operate the airport other than as a public airport or to enter into any contracts, leases, or other arrangements in connection with the operation of the airport which the department might not have undertaken under subsection (a) of this section.

(c) Miscellaneous fees and charges. The Department may fix and regulate, from time to time, reasonable landing fees for aircraft and

requirement to generate sufficient revenue to cover airport expenditures. HRS § 261–5(a).

The statutory scheme of chapter 261 allows the Department of Transportation to establish, operate and maintain the airport

other reasonable charges for the use and enjoyment of the airports and the services and facilities furnished by the department in connection therewith, including the establishment of a statewide landing fee which may vary among different classes of users such as foreign carriers, domestic carriers, inter-island carriers, air taxi operators and such other classes as may be determined by the director of transportation, for the purpose of meeting the expenditures of the statewide system of airports set forth in section 261–5(a), which includes expenditures for capital improvement projects approved by the legislature.

(d) Liens. To enforce the payment of any charges for repairs or improvements to, or storage or care of any personal property made or furnished by the department or its agent in connection with the operation of an airport or air navigation facility owned or operated by the department, the department shall have liens on the property, which shall be enforceable by it as provided by sections 507–18 to 507–22.

(e) Buildings and land areas for general aviation activities; developmental rates. The department may from time to time establish developmental rates for buildings and land areas used exclusively for general aviation activities at rates not less than fifty per cent of the fair market rentals of the buildings and land areas and may restrict the extent of buildings and land areas to be utilized. [L 1947, c 32, pt of § 1; am L 1949, c 374, § 1; am L 1953, JR 14, § 1; RL 1955, § 15–12; am L Sp 1959 2d, c 1, § 26; am L 1962, c 24, §§ 4, 5; HRS § 261–7; am L 1968, c 20, §§ 3, 4; am L 1972, c 14, § 1; am L 1976, c 235, § 2; am L 1981, c 243, § 2]

§ 261–9 *Contracts, Law governing.* The department of transportation may enter into any contracts necessary to the execution of the powers granted it by this chapter. All contracts made by the department shall be made pursuant to the laws of the State governing the making of like contracts; provided, that where the planning, acquisition, construction, improvement, maintenance, or operation of any airport, or air navigation facility is financed wholly or partially with federal monies, the department may let contracts in the manner prescribed by the federal authorities acting under the laws of the United States and any rules or regulations made thereunder. [L 1947, c 32, pt of § 1; RL 1955, § 15–15; am L Sp 1959 2d, c 1, § 26]

Haw.Rev.Stat. § 261–10:

§ 261–10 *Exclusive rights prohibited.* The department of transportation shall grant no exclusive right for the use of an airway, landing area, or air navigation facility under its jurisdiction. This section shall not prevent the making of contracts, leases, and other arrange-

ments pursuant to section 261–7. [L 1947, c 32, pt of § 1; RL 1955, § 15–16; am L Sp 1959, 2d, c 1, § 26]

Haw.Rev.Stat. § 261–11:

§ 261–11 *Public purpose of activities.* The acquisition of any lands or interests therein pursuant to this chapter, the planning, acquisition, establishment, construction, improvement, maintenance, equipment, and operation of airports and air navigation facilities; and the exercise of any other powers granted by this chapter to the department of transportation are declared to be public and governmental functions, exercised for a public purpose, and matters of public necessity. All lands and other property and privileges acquired and used by or on behalf of the State in the manner and for the purposes enumerated in this chapter shall and are declared to be acquired and used for public and governmental purposes and as a matter of public necessity. [L 1947, c 32, pt of § 1; RL 1955, § 15–17; am L Sp 1959 2d, c 1, § 26]

Haw. Rev. Stat. § 261–12:

§ 261–12 *Rules, standards.* (a) Powers to adopt. The director of transportation may perform such acts, issue and amend such orders, adopt such reasonable general or special rules and procedures, and establish such minimum standards, consistent with this chapter, as the director deems necessary to carry out this chapter and to perform the duties assigned thereunder, all commensurate with and for the purpose of protecting and insuring the general public interest and safety, the safety of persons operating, using or traveling in aircraft, and the safety of persons and property on land or water, and developing and promoting aeronautics in the State. No rule of the director shall apply to airports or air navigation facilities owned or operated by the United States.

In furtherance of the duties assigned under this chapter, the director may adopt rules relating to:

(1) Safety measures, requirements and practices in or about the airport premises;

(2) The licensing and regulation of persons engaged in commercial activities in or about the airport premises;

(3) The regulation of equipment and motor vehicles operated in or about the airport operational area;

(4) Airport security measures or requirements, and designation of sterile passenger holding areas and operational areas;

(5) The regulation of motor vehicles and traffic;

(6) Any other matter relating to the health, safety and welfare of the general public and persons operating, using, or traveling in aircraft.

system "out of appropriations and other moneys available or made available for such purposes" § 261–4(a). In so doing the department "may enter into contracts, leases, licenses, and other arrangements with any person ... [c]onferring the privilege of supplying goods, commodities, things, services, or facilities at the airport ...." § 261–7(a)(2). Other than the requirement, in § 261–5(a), that all revenues generated from such leases and contracts be paid into the statutorily created airport revenue fund, the statute sets no limits on how, with whom and for what price the department may contract for provision of airport services. The department is free to establish the terms and conditions of the contract as it sees fit and may fix the charges or rentals, limited only by the requirement that such charges be "reasonable and uniform for the same class of privilege, service, or thing". § 261–7(a). Finally, defendants point to § 261–11 which makes the operation of Hawaii's airports a "public and governmental function".

These sections read as a whole do not evince a clear legislative intent to displace competition with state regulation in the provision of airport taxi services. Rather they show state acquiescence in how the DOT Director and his Airport Chief decide to run things. In deposition both officials, and those who had formerly held the DOT directorship, admitted that the granting of exclusive concession contracts was a department and staff preference rather than a state policy.

There is evidence that the Hawaii legislature sought to avoid rather than encourage exclusive concessions at HIA. 1982 Journal of the Senate, Act 5, § 1; 1960 Journal of the Senate, Act 14, § 1. Chapter 102 of the Hawaii Revised Statutes requires that most concessions on public property, including the HIA currency concession at issue in *Deak-Perera,* be put up for public bid. The contracts for ground transportation at HIA, including taxi service, are specifically exempted from this competitive bidding requirement. § 102–2(b)(1). Legislative history suggests that this exemption was to prevent monopolization by a single contractor:

Prior to passage of Act 245, Session Laws of Hawaii, 1959, government agencies were empowered to grant by private negotiation concessions for profit on government land to private persons. For example, the Hawaii Aeronautics Commission granted concession rights to approximately fifty ground operators (taxi operators) at the several airports.... Act 245, Session of Laws of Hawaii 1959, by requiring that all such concessions or concession spaces be awarded by bid, deprives most of the incumbent concessionaires from having their licenses, leases or contracts renewed, however worthwhile their performances may be. Moreover *there is danger that such a system of awarding all concessions or concession spaces by bid could result in a monopoly. Such effects were not intended by the Legislature.*

1960 Journal of the Senate, Act 14 § 1 (emphasis added).

The 1960 amendment to Act 245, Session Laws of Hawaii 1959 exempted from competitive bidding lei vendors, coin operated machine vendors and all airport ground transportation except HIA taxi operators. In 1962 HIA taxicab drivers were added to the list of those concessionaires not required to competitively bid for an exclusive contract, because "especially in regards to the awarding of concessions at the new Honolulu International Airport [i]n many instances compliance with said Act [Act 245] creates the evils which this Act was intended to avoid." 1962 Journal of the Senate Act 5, § 1. There is no evidence that the legislature meant to require an exclusive contract for the provision of taxi service, and I cannot now read this intent into the statutory scheme. I therefore find that defendants have failed to show a clear articulation and affirmative expression of state policy to displace competition for state regulation in the provision of taxi service at HIA.

*Active State Supervision*

To avoid application of the federal antitrust laws, defendants must also show that

the clearly articulated state policy to displace competition has been replaced with active supervision of the conduct by the state itself. This requirement ensures that the state is doing more than merely legitimizing the anticompetitive conduct of the private parties with whom it has contracted. The state must be an active partner in the conduct, regulating and overseeing as a substitute for the "economic constraints of the competitive market" P. Areeda & D. Turner, I Antitrust Law: An Analysis of Antitrust Principles and Their Application ¶ 213, at 73 (1978).

■ On this record, I cannot find that the state is an active supervisor. The state, through its Department of Transportation, signed a contract with SIDA and collects from SIDA the agreed monthly fee. However, it does nothing further to ensure adequacy of the provision of taxi service, and in fact has no control over the SIDA taxi drivers. SIDA is an association of independent owner-operators, which itself exercises no control over the activities of individual drivers. No individual driver can be ordered to the airport to pick up deplaning passengers to meet airport needs; each driver is an independent entrepreneur. SIDA runs its own dispatch service, and no one from the state monitors this. SIDA's base yard is located off HIA grounds, and no state supervision is conducted there. The rates SIDA may charge its passengers are set, like those of all Honolulu licensed taxi operators, by city ordinance and not by state regulation.[16] Complaints about taxi drivers are routed to SIDA for action rather than being dealt with by the state. The evidence shows that it is SIDA cabbies and dispatchers who enforce the exclusivity of their contract; SIDA personnel intervene to prevent non-SIDA cabbies from accepting fares at HIA. In a letter to Hawaii's Governor Ariyoshi, the Director of defendant DOT, Dr. Ryokichi Higashionna, admitted that his department "has little control, if any, on SIDA's management of their

service." (Letter memorandum attached as Appendix A.)

## CONCLUSION

Defendants have failed to show that their conduct in entering into an exclusive contract is either pursuant to a clearly articulated and affirmatively expressed state policy or that the activity is actively supervised by the state itself. Defendants cannot, therefore, avail themselves of state action "immunity" from federal antitrust laws.

IT IS SO ORDERED.

## APPENDIX A

April 22, 1980

AIR 4265

MEMORANDUM

TO: The Honorable George R. Ariyoshi
 Governor of Hawaii

FROM: Director of Transportation

SUBJECT: TAXI SERVICE–HONOLULU INTERNATIONAL AIRPORT GOVERNOR REFERRAL 80:186–15

Airport taxi service is an essential part of ground transportation at large and medium hub airports. Taxi service at Honolulu, Hilo, Kahului, Lihue, and Ke-ahole is under exclusive licenses issued by the Department authorizing the licensee to solicit passengers at these airports. In return for this privilege, the licensee is required to provide a minimum level of service, including standards of competence and courtesy for drivers.

It is obvious management has a difficult time enforcing standards for their personnel. Our files have many letters from passengers complaining about the attitude and service provided by taxi operators. In addition to speeding and reckless driving, drivers are known to refuse to comply with parking restrictions on the number of vehi-

---

16. The city as licensor of all taxicab operators supervises taxicab activities through a comprehensive set of regulations; the state as airport owner-operator has nothing comparable. Chapter 12 of the Revised Ordinances of Honolulu deals with regulations for common carriers, including taxis. § 12–1.11 R.O.H. (1980) sets out the rates for fare and baggage charges.

cles in loading zones and create sanitation problems in the parking areas. Unsightly chemical toilets adjacent to the public parking lot are provided simply because SIDA management is unable to assure drivers will use public facilities in the terminal building.

Policing drivers will be continuous problem. Speeding and reckless driving can be controlled as soon as we are authorized more HPD officers. If necessary, we can insist that SIDA prohibit any driver that we find to undesirable from over serving the airport.

Jonathan Shimada has recently observed the problem and authorized additional enforcement by the HPD. Beyond that, DOT has little control, if any, on SIDA's management of their service.

/s/ Ryokichi Higashionna
Ryokichi Higashionna