John H. CAMPBELL, et al., Plaintiffs,

v.

The CITY OF CHICAGO, et al., Defendants.

No. 83 C 3884.

United States District Court, N.D. Illinois, E.D.

Sept. 22, 1983.

Michael T. Hannafan, Janet M. Koran, Steven P. Handler, Hannafan & Handler, Ltd., Chicago, Ill., for plaintiffs.

Robert W. Fioretti, Arthur N. Christie, James D. Montgomery, City of Chicago, Harold C. Hirshman, Kenneth H. Hoch, Stuart Altschuler, Sonnenschein Carlin Nath & Rosenthal, Jeremiah Marsh, Michael Schneiderman, William Carlisle Herbert, Hopkins & Sutter, Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

DECKER, District Judge.

Plaintiffs, John H. Campbell ("Campbell"), Isadore Head ("Head"), and Cornelius E. Scott ("Scott"), have brought this action against defendants, the City of Chicago ("the City"), Yellow Cab Company ("Yellow") and Checker Taxi Company, Inc. ("Checker"), pursuant to Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2. The action is brought on plaintiff's own behalf and on behalf of a class consisting of all persons who have held Public Vehicle Chauffeur's licenses issued by the City and who have leased or subleased taxicabs or licenses/medallions alone during the four-year period preceding the filing of the complaint. Currently pending are defendants' motions to dismiss the complaint for failure to state a claim upon which relief may be granted.[1]

### I. Factual Background.

■ In ruling on a motion to dismiss, the court must "take [the plaintiffs'] allegations to be true, and view them, together with reasonable inferences to be drawn therefrom, in the light most favorable to the plaintiff[s]." *Powe v. City of Chicago,* 664 F.2d 639, 642 (7th Cir.1981). According to the complaint, each plaintiff holds a Public Chauffeur's license issued by the City, which entitles him to drive a taxicab in the City. Between 1976 and January, 1980, Campbell leased various taxicabs with City medallions from Yellow; between July, 1981 and January, 1983, he leased various taxicabs with medallions from other City taxicab licensees; and between January, 1983, and the present, he has owned his own taxicab but has leased a City medallion from a separate company. Between 1976 and the present, Head has leased various taxicabs with medallions from Yellow. Between 1976 and late 1982, Scott leased various taxicabs with City medallions from both Yellow and Checker. Between late 1982 and the present, he has leased various taxicabs with City medallions exclusively from Checker. Plaintiffs have periodically asked representatives of the City's Department of Consumer Services, Public Vehicle Division, if they could obtain a City taxicab license and medallion directly from the City by simply remitting the annual license fee of $200.00. On each occasion, the City informed them that all licenses had already been issued and that none was available.

Yellow, a Maine corporation, owns, operates and leases taxicabs in the City. It currently holds 2,166 taxicab licenses issued by the City, the same number it has held since at least 1963. Checker, a New York corporation, also owns, operates and leases taxicabs in the City. It holds 1,500 taxicab licenses issued by the City, the same number it has held since at least 1963. All of Yellow's stock is owned by Checker Motors Corp., 44.6% of whose stock is owned by defendant Checker.

The gravamen of plaintiffs' complaint is that Yellow and Checker have conspired with each other to restrict the number of taxicab licenses which may be issued each year, and that they have obtained the City's agreement to enact an ordinance implementing that restriction. To properly analyze this claim, the court finds it necessary to briefly review the facts giving rise to the ordinance in question.[2]

---

1. Defendants Yellow and Checker have filed one joint motion to dismiss, and the City has filed a separate motion.

2. This historical overview was gleaned from *Yellow Cab Co. v. City of Chicago,* 23 Ill.2d 453, 178 N.E.2d 330 (1961); *People ex rel. Hafer v.*

*Flynn,* 13 Ill.2d 368, 150 N.E.2d 183 (1958); and *Yellow Cab Co. v. City of Chicago,* 396 Ill. 388, 71 N.E.2d 652 (1947).

The first comprehensive ordinance regulating the operation of taxicabs in Chicago was enacted in 1934. It provided for the issuance of licenses to operate taxicabs in the City for a term ending December 31, 1940, unless sooner terminated or revoked as provided in the ordinance. Pursuant to this ordinance, 4,108 licenses were issued, with Yellow receiving 2,166 and Checker receiving 1,500. Three years later, it was determined that a reduction in the number of taxicabs and an increase in the fares charged would further public convenience and necessity. Thus, in 1937, another ordinance was enacted by the Chicago City Council (the "Council"), providing for the voluntary surrender of licenses to reduce the total number of outstanding licenses from 4,108 to 3,000. Also included in this ordinance was a provision that those turning in their licenses would obtain priority rights on any new licenses that might subsequently be issued. That is, any new licenses would be issued in proportion to the number voluntarily surrendered by each licensee. The 1937 ordinance thus became effective when Yellow surrendered 571 licenses, Checker surrendered 500 and other licensees surrendered 37.

In 1945, the terms of the 1937 ordinance were extended until 1950. In 1946, the City proposed to issue additional licenses without regard to the above-noted priority provision. Yellow and Checker filed suit, and the Circuit Court of Cook County entered an injunction restraining the City from issuing any licenses in excess of 3,000 without first affording Yellow and Checker the opportunity to obtain such licenses in the manner set forth in the 1937 ordinance. One year later, the Illinois Supreme Court affirmed the Circuit Court's order, establishing the invalidity of licenses issued in violation of the priority provision of the 1937 ordinance. *Yellow Cab Co. v. City of Chicago*, 396 Ill. 388, 71 N.E.2d 652 (1947).

In 1952, Checker filed suit against the City in the Circuit Court of Cook County, No. 52 C 7331, and in 1957, Yellow brought a similar action, No. 57 C 11242. Both suits arose out of the same alleged violations of the priority provision at issue in the 1946 suit, and since the Illinois Supreme Court had already found in the equitable actions that the City had violated the 1937 ordinance, the only issue remaining in the new suits was the extent of damages for which the City was liable.

These damage actions were still pending in 1963. In a letter dated June 25, 1963, the presidents of Yellow and Checker jointly notified John C. Melaniphy, the City's Corporation Counsel, that the suits against the City would be dismissed if the Counsel enacted an ordinance amending Chapter 28 of the Municipal Code. The letter included stipulations to dismiss the damage actions, a stipulation to dissolve the injunction that had been affirmed by the Illinois Supreme Court in 1947 and a copy of a draft ordinance. The stipulations were to be filed in the Circuit Court of Cook County if and when the enclosed ordinance was passed by the Council, signed by the Mayor and rendered effective in all respects.

Pursuant to the proposal set forth in the June 25, 1963 letter, the Council amended Chapter 28 of the Municipal Code on July 1, 1963, and Yellow and Checker dismissed their respective damage suits. The ordinance proffered by Yellow and Checker and adopted by the Council authorizes the issuance of 4,600 licenses, Chicago Mun. Code, Public Passenger Vehicles § 28–22.-1(a), 2,666 of which are held by Yellow and 1,500 of which are held by Checker. It also provides that the Council, "at the request of the holders of a majority of the licenses at any time outstanding[,]" shall within 60 days after such request "hold hearings ... to determine whether public convenience and necessity may require additional taxicab service." *Id.* at § 28–22.1(c). Furthermore, holders of taxicab licenses under the ordinance enjoy protection from the issuance of additional licenses. New licenses, if issued at all, must be issued to holders of present licenses in proportion to the number they now retain. *Id.* at § 28–22.-

1(d)(I).[3] Finally, the ordinance provides that

"[n]othing in this ordinance shall be construed to limit the City in the exercise of its police powers and the City hereby expressly reserves the right to pass all reasonable ordinances and regulations affecting the licensees which may be necessary to promote or secure health, safety, morals, comfort, and general welfare; provided, however, that no ordinance or regulations shall hereafter authorize the issuance of any license for a taxicab nor shall any such license hereafter be issued except upon transfer or to permit replacement of a taxicab or in the annual renewal of such license and except as provided in Section 28–22.1 hereof."

*Id.* at § 28–31.1.

Plaintiffs contend that these provisions have been actively enforced since 1963. They note that while there are 4,600 licensed taxicabs, there are approximately 11,000 licensed taxidrivers in the City. Since at least 1975, Yellow and Checker have leased their taxicabs to independent drivers such as plaintiffs and the class they purport to represent on a daily or weekly basis. According to the complaint, both Yellow and Checker currently charge a daily rental fee of approximately $55 for the use of both the City license and taxicab, approximately $24 of which is attributable to the lease cost of the City license. The driver pays an additional amount for automobile liability insurance and fuel. Alternatively, both Yellow and Checker currently charge a driver who owns his own taxicab approximately $165 per week for leasing the license, which results in an average daily lease cost of approximately $24 for a City license. Plaintiffs assert that because the defendant companies hold 80% of the total number of licenses, other competing taxicab companies are able to charge comparable lease rates.

Any person who for the past several years wished to compete in the taxicab market and operate a taxicab service without leasing a City license has had to purchase that license from an existing license holder. As a result, the City licenses held by Yellow, Checker and other cab companies maintain a market value of $12,500.00 to $15,000.00. Plaintiffs cite as an example Checker's August 9, 1982, agreement to sell and transfer 85 of its City licenses to independent cab drivers or other cab companies at an average price of $13,841.00 per license. They also rely on Yellow's July, 1982 agreement to sell and transfer 13 of its City licenses at an average price of $13,000.00 per license. Plaintiffs charge that they and members of the class they seek to represent find these prices to be prohibitive, and that they are therefore precluded from entering the taxicab market.

Defendants' agreement to restrict the number of taxicab licenses is designed, according to plaintiffs, to eliminate competitors of Yellow and Checker from the Chicago taxicab market; to prevent additional competitors from entering this market; to further the acquisition of artificially high profits; and to maintain artificially high passenger fares. They assert that the free market entry of their purported class through elimination of the City's license restriction would lead to a reduction in passenger waiting time; the implementation of better overall service; a vast increase in service to lower income neighborhoods and non-congested downtown areas; a reduction in periodic fare increases; an increase in the kinds of taxicab service available; and an increase in supplemental employment for drivers.

In Count I, plaintiffs contend that the promulgation and enactment of the 1963 ordinance constitutes a horizontal contract, combination or conspiracy in restraint of

---

**3.** This section states:

"(d) If the Council shall authorize the issuance of additional licenses, they shall be issued on application:

(I) to licensees then holding more than one license, the same proportion of the number of licenses to be issued as the number of licenses then held by such licensee bears to the total number of licenses then outstanding, giving no effect to fractions of licenses; ..."

trade between Yellow, Checker and the City in violation of the Sherman Act, 15 U.S.C. § 1. In Count II, they assert that this same conduct on the part of defendants constitutes a contract, combination or conspiracy to monopolize the Chicago taxicab market in violation of Section 2 of that Act, 15 U.S.C. § 2. Plaintiffs charge that they and members of their purported class have been damaged in excess of $106,832,-000.00, an amount which they claim should be trebled. Plaintiffs also request that this court enjoin defendants from enforcing the license restriction and order the City to issue taxicab licenses to all those who apply for them and who are otherwise qualified to obtain them upon payment of the $200.00 annual license fee. Finally, they ask that the court declare section 22.1 of Chapter 28 of the City's Municipal Code null, void and invalid insofar as it restricts the number of taxicab licenses which can be issued by the City.

## II. Defendants' Motions to Dismiss.

In support of their motion to dismiss, defendants Yellow and Checker assert that the alleged concerted activity of which plaintiffs complain is beyond the scope of the federal antitrust laws under the "state action exemption" originally promulgated in *Parker v. Brown*, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943). Relying on the so-called *Noerr-Pennington* doctrine, the cab companies also claim that the antitrust laws cannot be applied to prohibit them from exercising their First Amendment rights by petitioning the City to enact or amend municipal ordinances. The City joins in these arguments, and contends additionally that the complaint fails to allege a sufficient effect upon interstate commerce.

## III. Discussion.

### A. The State Action Doctrine.

In *Parker v. Brown*, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943), the Supreme Court first addressed the question of whether the federal antitrust laws prohibit a state from exercising its sovereign pow-

ers to impose certain anti-competitive restraints. It held that a marketing program enacted by the California legislature to create price supports for raisins was exempt from challenge under the Sherman Act by virtue of limitations in that Act and concepts of federalism:

"We find nothing in the language of the Sherman Act or in its history which suggests that its purpose was to restrain a state or its officers or agents from activities directed by its legislature. In a dual system of government in which, under the Constitution, the states are sovereign, save only as Congress may constitutionally subtract from their authority, an unexpressed purpose to nullify a state's control over its officers and agents is not lightly to be attributed to Congress."

*Parker*, 317 U.S. at 350–51, 63 S.Ct. at 313.

The Supreme Court subsequently faced the question of whether the "state action" exemption of *Parker* protected a municipality from federal antitrust liability in *City of Lafayette, Louisiana v. Louisiana Power & Light Co.*, 435 U.S. 389, 98 S.Ct. 1123, 55 L.Ed.2d 364 (1978). There, a private utility company brought suit under the Sherman Act against several Louisiana cities empowered to own and operate electric utility systems, alleging that they had committed various antitrust offenses in the operation of those systems. A majority of the Court agreed only that Congress did not intend to exempt local governments *per se* from the antitrust laws. *City of Lafayette*, 435 U.S. at 394, 98 S.Ct. at 1127. A plurality of four justices nonetheless recognized that municipalities are instrumentalities of the state, and that their actions may reflect state policy. The plurality thus held that "the *Parker* doctrine exempts only anticompetitive conduct engaged in as an act of government by the State as sovereign, or, by its subdivisions, pursuant to state policy to displace competition with regulation or monopoly public service." *Id.* at 413, 98 S.Ct. at 1137.

The plurality in *City of Lafayette* further observed that a state policy to displace

competition could not be found "in the absence of evidence that the State authorized or directed a given municipality to act as it did, ..." *Id.* at 414, 98 S.Ct. at 1137. It rejected the position, however, that "a political subdivision necessarily must be able to point to a specific, detailed legislative authorization before it properly may assert a *Parker* defense to an antitrust suit." *Id.* at 415, 98 S.Ct. at 1138. Rather, the plurality stated that an adequate state mandate exists when it is found " 'from the authority given a governmental entity to operate in a particular area, that the legislature *contemplated the kind of action complained of.*' " *Id.* (citation omitted; emphasis supplied).[1]

In *Community Communications Co., Inc. v. City of Boulder, Colorado*, 455 U.S. 40, 102 S.Ct. 835, 70 L.Ed.2d 810 (1982), the Supreme Court had another opportunity to address the application of the state action doctrine to municipal conduct. The Court sought to determine whether the *Parker* immunity extended to a "home rule" municipality that was granted extensive powers in local and municipal matters by the state constitution. The Court concluded that the restraint in question, a moratorium on the expansion of cable television enacted by the City Council of Boulder, could not be exempt from antitrust scrutiny unless it constituted "the action of the [state] itself in its sovereign capacity," or "municipal action in furtherance of implementation of clearly articulated and affirmatively ex-

pressed state policy, ..." *City of Boulder*, 455 U.S. at 52, 102 S.Ct. at 841.[5] The Court held that the general delegation of state powers to the city under the home rule amendment failed to satisfy either prong of this test, stating with respect to the second prong that the delegation of the amendment did not provide an "adequate state mandate" for the city's action. *Id.* at 55, 102 S.Ct. at 842. The Court concluded:

"[T]he requirement of 'clear articulation and affirmative expression' is not satisfied when the State's position is one of mere *neutrality* respecting the municipal actions challenged as anticompetitive. A State that allows its municipalities to do as they please can hardly be said to have 'contemplated' the specific anticompetitive actions for which municipal liability is sought. Nor can those actions be truly described as 'comprehended within the powers *granted,*' since the term, 'granted,' necessarily implies an affirmative addressing of the subject by the State. The State did not do so here: The relationship of the State of Colorado to Boulder's moratorium ordinance is one of precise neutrality."

*Id.* at 55, 102 S.Ct. at 843 (emphasis in original).

Recently, in *Town of Hallie v. City of Eau Claire*, 700 F.2d 376 (7th Cir.1983), *petition for cert. filed*, 51 U.S.L.W. 3842 (U.S. May 11, 1983) (No. 82–1832), the United States Court of Appeals for the Seventh

---

**4.** Chief Justice Burger concurred in part, arguing that only "proprietary" activities of local governments should be subject to the antitrust laws. *City of Lafayette*, 435 U.S. at 418–26, 98 S.Ct. at 1139–43 (Burger, C.J., concurring in part and in the judgment). While Chief Justice Burger agreed with the plurality that the threshold inquiry should be whether the anti-competitive activity is required by the state acting as sovereign, *Id.* at 425, 98 S.Ct. at 1143, he would require a supplemental inquiry as to whether the exemption from federal antitrust liability "was necessary in order to make the regulatory Act work, 'and even then only to the minimum extent necessary.' " *Id.* at 426, 98 S.Ct. at 1143 (quoting *Cantor v. Detroit Edison Co.,* 428 U.S. 579, 597, 96 S.Ct. 3110, 3121, 49 L.Ed.2d 1141 (1976)).

**5.** The "clear articulation and affirmative expression" requirement applied in *City of Boulder* derives from dictum in the *City of Lafayette* decision. The *City of Lafayette* plurality used the phrase in discussing *Bates v. State Bar of Arizona*, 433 U.S. 350, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977), one of several cases cited to refute the proposition that a municipality's status as a governmental unit automatically brings it within the state action doctrine. *See City of Lafayette*, 435 U.S. at 410, 98 S.Ct. at 1135. In *California Retail Liquor Dealers Association v. Midcal Aluminum, Inc.,* 445 U.S. 97, 105, 100 S.Ct. 937, 943, 63 L.Ed.2d 233 (1980), the Court announced a "clear articulation" test based on the *City of Lafayette/Bates* dictum. Unlike *City of Boulder*, however, *Midcal*, involved private parties that were given power over price and that were completely free of state supervision.

Circuit interpreted and applied the state action doctrine as it has developed from *Parker* to *City of Boulder*. There, four Wisconsin townships alleged that the City of Eau Claire was using its monopoly over sewage treatment services in a manner violative of Section 1 of the Sherman Act. The only sewage treatment facility available to the towns was within the city limits, and the city refused to provide them with service. The city would have provided the towns with sewage treatment services if they had agreed to become annexed by the city. *Town of Hallie*, 700 F.2d at 378.

Sitting by designation, Senior Circuit Judge Wisdom first rejected the towns' contention that the city had to point to a state policy authorizing its use of monopoly power over sewage treatment to gain monopolies in sewage collection and transportation. Relying on *City of Lafayette*, Judge Wisdom held:

> "[I]f we can determine that the state gave the City authority *to operate in the area of sewage services and to refuse to provide treatment services*, then we can assume that the State contemplated that anticompetitive effects might result from conduct pursuant to that authorization. The district court properly focused on *determining if authorization for the refusal to provide sewage treatment exists* rather than attempting to find a specific authorization for the monopolizing effect that results from refusing to provide these services. If the state authorizes certain conduct, we can infer that it condones the anticompetitive effect that is a reasonable or foreseeable consequence of engaging in the authorized activity."

*Town of Hallie*, 700 F.2d at 381 (footnotes omitted; emphasis supplied). The court then rejected the towns' argument that the city had to point to a state policy *compelling* the challenged conduct to gain *Parker* protection. Noting that the "critical inquiry is to determine if the anticompetitive conduct undertaken by a municipality constitutes state action[,]" the court stated that antitrust immunity is conferred if a municipality acts "pursuant to clearly articulated and affirmatively expressed state policy which evidences an intent to the legislature to displace competition with regulation—whether compelled, directed, authorized, or in the form of a prohibition...." *Id.* *See also Gold Cross Ambulance and Transfer v. City of Kansas City*, 705 F.2d 1005, 1012 n. 11 (8th Cir.1983). Finally, Judge Wisdom rejected the towns' claim that immunity depended on a showing that the state actively supervised the anti-competitive conduct of the city. Observing that active state supervision had been required only in cases in which the defendants were private entities or individuals, *see, e.g., California Retail Liquor Dealers Association v. Midcal Aluminum, Inc.*, 445 U.S. 97, 100 S.Ct. 937, 63 L.Ed.2d 233 (1980),[6] Judge Wisdom held that a state is not held to the high standard of active supervision of the conduct of a city performing a traditional municipal function for that city to receive *Parker* protection. *Town of Hallie*, 700 F.2d at 383–84. *See also Gold Cross Ambulance*, 705 F.2d at 1014–1015.[7]

The court in *Town of Hallie* concluded that the challenged conduct was in furtherance of a clearly articulated and affirmatively expressed state policy. It relied on

---

6. Indeed, in *City of Boulder*, the Supreme Court specifically left open the question of whether a municipality must show active supervision over its conduct in order to receive protection under *Parker*:

> "Because we conclude in the present case that Boulder's moratorium ordinance does not satisfy the 'clear articulation and affirmative expression' criterion, we do not reach the question whether that ordinance must or could satisfy the 'active state supervision' test focused upon in *Midcal*.

*City of Boulder*, 455 U.S. at 51–52 n. 14, 102 S.Ct. at 841 n. 14.

7. Both the *Town of Hallie* court, 700 F.2d at 384 n. 18, and the *Gold Cross Ambulance* court, 705 F.2d at 1014 n. 13, reserved the question of whether municipal conduct that falls outside the scope of a traditional governmental function—and, therefore, which may pose a more significant threat to competition—must be actively supervised by the state to receive *Parker* immunity.

Wisconsin statutes specifically authorizing the city to fix the limits of its utility service, imposing no obligation to serve beyond the area so fixed and providing that any order of the department of natural resources to extend the sewage system becomes void if the town to receive the service refuses to submit to annexation. The court found that these statutes, as well as a state court decision interpreting them, evidenced a clear state policy of requiring annexation as a condition to receiving municipal services. *Town of Hallie,* 700 F.2d at 382–83.

■ It is clear from these decisions that the following elements must be established in order to achieve *Parker* immunity: the municipality must have acted pursuant to a clearly articulated and affirmatively expressed state policy, and that policy must evidence an intent of the legislature to displace competition. Thus, the threshold inquiry involves an examination of the state statute which purportedly contains the direction or authorization for the anticompetitive conduct challenged. All parties in this case point to Ill.Rev.Stat. ch. 24, § 11–42–6:

> "The corporate authorities of each municipality may license, tax, and regulate hackmen, draymen, omnibus drivers, carters, cabmen, porters, expressmen, and all others pursuing like occupations, and may prescribe their compensation."

■ Applying the principle set forth in *City of Boulder, City of Lafayette* and *Town of Hallie,* this court concludes that plaintiffs' complaint cannot be dismissed on the basis of the state action doctrine. The Illinois statute upon which defendants rely simply does not constitute a clearly articulated and affirmatively expressed policy to displace competition, particularly in light of that test's rather strict interpretation and application in *City of Boulder.* While the statute need not constitute a "specific, detailed legislative authorization," it must be clear that the legislature "contemplated the kind of action complained of." The statute at issue in this case authorizes the licensing and regulation of taxicabs, but it no-

where sanctions the creation of a set of private rights that are perpetually binding on the City. While earlier ordinances had set limits on the number of taxicabs, none of them stemmed directly and unequivocally from an agreement between the city and a private party or parties. Here, the defendant cab companies agreed to dismiss their damage suits against the City on the express condition that the Council enact an ordinance which the companies themselves had authored. The 1963 ordinance exacted from the City a perpetual promise as a *sine qua non* for dismissal of the damage suits filed in 1952 and 1957. The anticompetitive effects which allegedly resulted from this creation of private rights perpetually binding on the City cannot logically be viewed as a "necessary or reasonable consequence of engaging in the authorized activity." Areeda, *Antitrust Immunity for "State Action" After Lafayette,* 95 Harv.L.Rev. 435, 446 (1981).

The neutrality which characterizes the Illinois statute can perhaps best be illustrated through a comparison of other statutes which have been scrutinized under the *City of Boulder* and *City of Lafayette* standards. For example, as discussed above, the statutes in *Town of Hallie* plainly indicated that annexation was a condition to receiving municipal services. *See Town of Hallie,* 700 F.2d at 382–83 and n. 13–14. A second example is found in *Gold Cross Ambulance and Transfer v. City of Kansas City,* 705 F.2d 1005 (8th Cir.1983). There, two privately run ambulance services challenged Kansas City's ambulance system under which a municipal trust contracted with a single private operator to provide all ambulance service within the city. In a thoughtful and well-reasoned opinion, the Eighth Circuit held that Kansas City had acted pursuant to a clearly articulated and affirmatively expressed state policy. As part of a comprehensive regulatory scheme, the Missouri legislature expressly permitted cities to provide ambulance service to its citizens, to acquire the necessary equipment, to "contract with one or more" operators in providing the ambu-

lance service and to promulgate rules to regulate the provision of that service. *See Gold Cross Ambulance,* 705 F.2d at 1011–12 and n. 9 (relying on Mo.Rev.Stat. § 67.-300). The court concluded that the legislature, in specifically allowing a city to contract with "one or more" operators, clearly contemplated that a city might provide ambulance service to its residents by means of a single operator. *Id.* at 1013–14.

Also relevant to this court's analysis of the Illinois statute is *Woolen v. Surtran Taxicabs, Inc.,* 461 F.Supp. 1025 (N.D.Tex. 1978). In *Woolen,* plaintiff cab drivers challenged an arrangement whereby certain cities had granted a private taxicab firm the exclusive privilege of picking up passengers at the airport. The cities and the private firm sought to dismiss the complaint on the ground that they were immune under *Parker.* Defendants relied, in part, on a Texas statute which specified that a city could "prohibit the use of any street ... of the city by any ... character of public utility without first obtaining the consent of the governing authorities ..." and "regulate, license and fix the charges or fares made by any person owning, operating or controlling any vehicle of any character used for the carrying of passengers for hire." Tex.Stat.Ann. art. 1175 (Vernon 1963). The court concluded that defendants were not immune, finding that this statute did not "evidence a state policy to displace competition." *Woolen,* 461 F.Supp. at 1031–32.[8]

Defendants contend that Illinois courts have repeatedly affirmed the City's authority to limit the availability of licenses pursuant to Ill.Rev.Stat. ch. 24, § 11–42–6. For example, they rely heavily on *Yellow Cab Co. v. City of Chicago,* 396 Ill. 388, 71 N.E.2d 652 (1947), noted in Part I, *supra,* which affirmed an injunction restraining the City from issuing new licenses in a manner contravening the priority provision of the 1937 ordinance. While the court in *Yellow Cab* rejected the contention that the City could not limit or restrict the number of taxicabs to be operated on its streets, *Yellow Cab,* 396 Ill. at 397–98, 71 N.E.2d 652, it specifically noted that "no taxi operator and no person who desires to enter the taxicab business has, in this cause, complained of a monopoly." *Id.* at 398–99, 71 N.E.2d 652. The court also observed that the City had reserved the right to issue additional licenses without the consent of any of the licensees, and that the sole restriction on such issuance was that there be a finding of public convenience and necessity. *Id.* at 399, 71 N.E.2d 652. Finally, the *Yellow Cab* court noted that the provision giving to licensees who surrendered their licenses a priority right to regain the licenses if the issuance of additional ones was authorized by the Council was quite limited, as it merely awarded a preference for a period of 30 days after the publication of notice of public hearing upon the question of public convenience and necessity. If the former licensees failed to apply for the new

**8.** *See also Charley's Taxi Radio Dispatch Corp. v. SIDA of Hawaii, Inc.,* 562 F.Supp. 712 (D.Hawaii 1983); *Schiessle v. Stephens,* 525 F.Supp. 763 (N.D.Ill.1981). In *Charley's Taxi,* the state of Hawaii and an association of independent taxicab owners entered into a contract whereby the association acquired the exclusive right to provide metered taxicab service to deplaning passengers at the state-owned airport. Plaintiff, a competitor of the association, challenged the agreement as violative of sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2. Rejecting the defendants' argument that they were immune under *Parker,* the court concluded, in part, that there was no clearly articulated and affirmatively expressed state policy to displace competition in the provision of taxi service at the airport. While the relevant statutes were quite detailed, the court found that they merely set forth "a

vague, unrestrained grant of authority to the Department of Transportation to run the airport as it chooses, bound only by the statutory requirement to generate sufficient revenue ...." *Charley's Taxi,* 562 F.Supp. at 720–21.

In *Schiessle,* plaintiff contended that the village of Rosemont, village officials and private developers had conspired to violate both the Sherman Act and the Clayton Act by adopting a "sham" redevelopment plan pursuant to which plaintiff's property was taken by eminent domain. The court found that the Illinois statutes which permit a municipality to redevelop property within its boundaries did not suggest that the state authorized the municipality or its officers "to violate the federal antitrust laws by passing a 'sham' redevelopment plan to further a conspiracy with private developers." *Schiessle,* 525 F.Supp. at 776.

licenses within the 30-day period, anyone who desired a license could obtain one provided he met the general requirements of the ordinance. *Id.* at 400, 71 N.E.2d 652. Importantly, the court stated:

> "It is clear that no exclusive right to operate taxicabs has been granted to any person or corporation in expressed terms. The fact that [the cab companies] may be the only persons who surrendered taxicab licenses and are, therefore, the only persons entitled to the preference does not render the ordinance void, since the ordinance is of general application and *since the preference in obtaining additional licenses is given for only a limited time* and is based upon a valuable consideration."

*Id.* at 400–01, 71 N.E.2d 652 (emphasis supplied).

This careful examination of *Yellow Cab* plainly indicates that the decision does not require this court to find defendants immune from antitrust liability. First, *Yellow Cab,* unlike this case, did not involve any claim of monopoly power. Second, the 1937 ordinance scrutinized in *Yellow Cab* did not restrict the City's power to grant licenses to all other applicants, as additional licenses could be issued without the consent of any licensee. Under the ordinance challenged in this action, however, "the holders of a majority of the licenses"—Yellow and Checker—retain the right to *require* the City to re-examine the number of outstanding licenses. Moreover, under the priority provision set forth in section 28–22.1(d)(I), Yellow and Checker will always be "the holders of a majority of the licenses." Indeed, the priority right established by this section serves as the third and most significant factor distinguishing the instant action from *Yellow Cab.* The *Yellow Cab* court emphasized that the 1937 ordinance granted no party any exclusive right to operate taxicabs, as the priority provision of that ordinance was effective for only a limited period. In contrast, under the 1963 ordinance, even if the Council determines that public convenience and necessity require the issuance of additional licenses, such licenses *must* be issued to holders of present licenses in proportion to the numbers they now retain. This priority provision includes no time limit whatsoever, thereby guaranteeing to Yellow and Checker *in perpetuity* their 80% shares of all outstanding licenses.

Defendants have also relied on *Chirikos v. Yellow Cab Co.,* 87 Ill.App.3d 569, 43 Ill.Dec. 61, 410 N.E.2d 61 (1st Dist.1980). There, plaintiff filed a class action against various cab companies licensed by the City, alleging that the ordinance dealing with taxicab rates was illegal and should be rescinded. Plaintiff sought refunds of various overcharges allegedly collected by defendants. The court affirmed the dismissal of plaintiff's complaint, holding, in part, that defendants were not liable under the Illinois Antitrust Act, Ill.Rev.Stat. ch. 38, § 60–1 *et seq,* and relying on *Parker* in reaching this conclusion. *Chirikos,* 87 Ill. App.3d at 579–80, 43 Ill.Dec. 61, 410 N.E.2d 61. The court does not find this holding to be persuasive on the facts presented in this case, however, on the ground that taxicab *fares* are accorded significantly different statutory treatment than the number of taxicab *competitors.* Ill.Rev.Stat. ch. 24, § 11–42–6 expressly provides that "[t]he corporate authorities of each municipality ... may prescribe their [cabmen] compensation." A similar statutory mandate is lacking with respect to the issue presented in the instant case.

Defendants' suggestion that these Illinois decisions are necessarily determinative of the state action question must be rejected for a reason beyond the simple fact that they are distinguishable on their face. In *City of Boulder,* the city relying on several state court decisions, contended that the home rule amendment vested in it "every power" possessed by the legislature in local and municipal affairs. *City of Boulder,* 455 U.S. at 52, 102 S.Ct. at 841. The city may very well have adhered to this strategy because of the Tenth Circuit's great emphasis on the interpretation of that amendment by the Colorado Supreme Court. *See Community Communications Co., Inc. v. City of Boulder, Colorado,* 630

F.2d 704, 707 (10th Cir.1980), *rev'd,* 455 U.S. 40, 102 S.Ct. 835, 70 L.Ed.2d 810 (1982). The Supreme Court, however, in reversing the Tenth Circuit, rejected the relevance of state court holdings on the scope of Colorado home rule authority:

> "[I]t is not for us to determine the correct view on this issue as a matter of state law. *Parker* affords an exemption from *federal* antitrust laws, based on *Congress'* intentions respecting the scope of those laws. Thus ·the availability of the *Parker* exemption is and must be a matter of federal law."

*City of Boulder,* 455 U.S. at 52 n. 15, 102 S.Ct. at 841 n. 15 (emphasis in original).[9]

In sum, therefore, the court finds that the state action doctrine does not mandate dismissal of plaintiffs' complaint. The Illinois statute at issue does not constitute a clearly articulated and affirmatively expressed policy to displace competition. The specificity which characterizes the statutes at issue in *Town of Hallie* and *Gold Cross Ambulance* is lacking here.

B. *The Noerr-Pennington Doctrine.*

As previously noted, defendants have also relied on the so-called *Noerr-Pennington* doctrine in moving to dismiss plaintiffs' complaint. The doctrine, as its name indicates, has been distilled from two decisions. In *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.,* 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961), trucking industry representatives sued a railroad trade association, alleging that a publicity campaign advocating legislation favorable to the railroads violated the Sherman Act because the campaign's sole purpose was to hamper the trucking industry's ability to compete with the railroads. The Supreme Court held that "no violation of the [Sherman] Act can be predicated upon mere attempts to influence the passage or enforcement of law." *Noerr,* 365 U.S. at 135, 81 S.Ct. at 528. While the *Noerr*

holding was, strictly speaking, a matter of statutory construction, *Id.* at 132 n. 6, 81 S.Ct. at 526 n. 6, First Amendment concerns clearly influenced the decision. The Court feared that the Sherman Act would impinge upon the right to petition and impair the government's ability "to take actions through its legislature and executive that operate to restrain trade." *Id.* at 137, 81 S.Ct. at 529. The Court also found the question of intent irrelevant, stating that "insofar as the railroads' campaign was directed toward obtaining governmental action, its legality was not at all affected by any anticompetitive purpose it may have had." *Id.* at 139–40, 81 S.Ct. at 531. In dictum, however, the Court indicated that "[t]here may be situations in which a publicity campaign, ostensibly directed toward influencing governmental action, is a mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of a competitor and the application of the Sherman Act would be justified." *Id.* at 144, 81 S.Ct. at 533.

*Noerr* was followed by *United Mine Workers of America v. Pennington,* 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965), where an industry union and large firms urged the Secretary of Labor to establish minimum wage levels that would have the effect of squeezing out smaller firms. The Court stated that "[j]oint efforts to influence public officials do not violate the antitrust laws even though intended to eliminate competition. Such conduct is not illegal, either standing alone or as part of a broader scheme itself violative of the Sherman Act." *Pennington,* 381 U.S. at 670, 85 S.Ct. at 1593. The Court also reiterated that *Noerr* immunity obtains so long as the attempt to influence government action is made in good faith.

---

**9.** In *Town of Hallie,* the court did, of course, partly rely on the Wisconsin court's interpretation of the statutes in question. In light of the rather clear language of the *City of Boulder* Court, this reliance must have been secondary to the express statutory language conditioning

the receipt of municipal services upon annexation. The Supreme Court's directive in *City of Boulder* plainly precludes state municipal law from assuming a pivotal role in determining the applicability of *Parker* protection.

In *California Motor Transport Co. v. Trucking Unlimited,* 404 U.S. 508, 512, 92 S.Ct. 609, 612, 30 L.Ed.2d 642 (1972), a group of trucking companies opposed " 'with or without probable cause, and regardless of the merits of the cases,' " each and every license application made by the group's competitors to a state regulatory agency. The Court first extended the *Noerr-Pennington* doctrine to administrative and judicial proceedings. It also, however, applied the "sham litigation" exception for the first time, holding that the common plan to oppose every application stated a cause of action under the antitrust laws. The Court indicated that where "the administrative and judicial processes [are] abused," *California Motor Transport,* 404 U.S. at 513, 92 S.Ct. at 613, in an attempt to stifle competition, *Noerr-Pennington* is inapplicable. The focus of the Court's concern was the "illegal result" of the abuse, namely, "effectively barring respondents from access to the agencies and courts." *Id.*

The rulings of the Supreme Court in *Noerr-Pennington* and *California Motor Transport* were derived from fact situations involving private parties who allegedly had conspired to induce governmental action. This case presents a different question, namely, whether the protections afforded by the *Noerr-Pennington* doctrine are lost when private parties and a governmental entity or official are alleged to have collaborated together in obtaining the challenged result.

In *California Motor Transport,* 404 U.S. at 513, 92 S.Ct. at 613, the Supreme Court stated in dictum that "[c]onspiracy with a licensing authority to eliminate a competitor may also result in an antitrust transgression." In *Duke & Co. Inc. v. Foerster,* 521 F.2d 1277 (3d Cir.1975), plaintiffs alleged that various municipal corporations, private corporations and a government official conspired to ensure that municipal facilities boycotted plaintiffs' products. Defendants contended that the exclusion of plaintiffs' products was a result of petitioning activity directed to influence governmental action. The Third Circuit concluded that "[w]here the complaint goes beyond

mere allegations of official persuasion by anticompetitive lobbying and claims official participation with private individuals in a scheme to restrain trade, the *Noerr-Pennington* doctrine is inapplicable." *Foerster,* 521 F.2d at 1282.

The position set forth in *Foerster* must be compared with the Seventh Circuit's decision in *Metro Cable Co. v. CATV of Rockford, Inc.,* 516 F.2d 220 (7th Cir.1975). There, plaintiff, a cable television company which applied for and failed to receive a franchise in Rockford, sued the company which did receive the franchise, CATV, that company's affiliate, four individuals associated with those companies and the mayor and an alderman of the city. Plaintiff alleged that CATV was organized, in part, to induce the mayor and the alderman to oppose plaintiff's application and to persuade the city council not only to award the franchise to CATV but also to refuse plaintiff's successive applications. *Metro Cable,* 516 F.2d at 222–24. The court held that allegations that the mayor and the alderman had participated as co-conspirators were not sufficient to take the case outside the reach of the *Noerr-Pennington* doctrine:

> "Nothing in the *Noerr* opinion or any other case of which we are aware suggests any reason for believing that Congress, not having intended the Sherman Act to apply to combined efforts to induce legislative action, did intend the Act to apply if a member of the legislative body agreed to support those efforts."

*Id.* at 230.

*Metro Cable* itself was distinguished in *Kurek v. Pleasure Driveway & Park District of Peoria, Illinois,* 557 F.2d 580 (7th Cir.1977), *vacated and remanded in light of City of Lafayette v. Louisiana Power & Light Co.,* 435 U.S. 992, 98 S.Ct. 1642, 56 L.Ed.2d 81 (1978), *antitrust judgment reinstated,* 583 F.2d 378 (7th Cir.1978), *cert. denied,* 439 U.S. 1090, 99 S.Ct. 873, 59 L.Ed.2d 57 (1979). In *Kurek,* plaintiff alleged, in part, that the park district, a unit of local government, had agreed with a private potential concessionaire that the latter would make an economically unrealistic proposal for concession rights at five municipal golf courses. Plaintiffs, who

had been concessionaires at the golf courses, alleged that the proposal was used to coerce them into a 5% sales taxing, and a price raising/fixing scheme. Plaintiffs claimed that they refused to be coerced and subsequently lost their leases and concessions, after which the co-conspirator concessionaire was awarded concession rights at all five golf courses. Concluding that the *Noerr-Pennington* doctrine was inapplicable, the Seventh Circuit looked to whether the actions of the public officials were within the scope of their authority: "Our determination that the Park District and its officials had no state mandate or authority to engage in the activities attacked here necessarily reduces the applicability of the reasoning of *Noerr...*." *Kurek*, 557 F.2d at 593. The court also noted that the economically unrealistic nature of the proposal, alleged to have been known to Park District officials, arguably supported an inference that the co-conspirator concessionaire did not make a genuine effort to obtain the concession rights but instead lended its support to the Park District's attempted coercion of plaintiff's pricing policies. *Id.* at 594.

■ Resolution of the private defendant/public official collaboration issue thus appears to turn on whether the actions of the public officials were within the scope of their authority and whether the private activities, notwithstanding the collaboration, were genuine efforts to influence lawful action. In the case at bar, a serious question has been raised as to whether City officials conspired with private parties and, in allegedly doing so, whether they acted outside the scope of very general authority granted to them to regulate and license taxicabs. As set forth in detail in Part I, *supra*, the ordinance under attack here was presented as part of a settlement proposal involving the agreed dismissal of damage actions brought by Yellow and Checker. The ordinance was drafted and offered by the very same parties who, by virtue of its enactment, obtained a set of private rights which they can enforce in perpetuity against the City. It is beyond dispute, therefore, that the ordinance in question was not considered, drafted, proposed and debated in the normal course of legislative decision-making, but rather resulted from an explicit agreement between private parties and public officials. If it is established that City Council members conspired to take this action in a manner inconsistent with their proper roles in taxicab regulation and licensing, the *Noerr-Pennington* doctrine would not serve to protect them. Thus, the circumstances under which the ordinance challenged here was presented to the City Council and the question that it raised concerning the City officials' authority to enact such an ordinance preclude dismissal.

### C. *Interstate Commerce.*

The final question arises out of defendant City of Chicago's claim that plaintiffs have not adequately alleged the requisite effects on interstate commerce. The City contends that the ordinance in question is purely a local regulation.

■ One of the prerequisites to a cause of action under the Sherman Act "is the existence of a demonstrable nexus between defendants' activity and interstate commerce." *McLain v. Real Estate Board of New Orleans, Inc.*, 444 U.S. 232, 246, 100 S.Ct. 502, 511, 62 L.Ed.2d 441 (1980). *See also Goldschmidt v. Patchett*, 686 F.2d 582, 584–85 (7th Cir.1982). The jurisdictional element of a Sherman Act violation may be established by a showing of activities "actually *in* interstate commerce" or by activities which, "while wholly local in nature, nevertheless substantially *affect* interstate commerce." *McLain*, 444 U.S. at 241, 100 S.Ct. at 508 (emphasis in original). A complaint adequately alleges jurisdiction under the first prong of this test if it sets forth facts which demonstrate that the defendants' activities restrained goods or services within the flow of interstate commerce or were integrally related to an interstate transaction. *Id.* at 244, 100 S.Ct. at 510. To establish jurisdiction under the second prong, plaintiff need not show that the defendants' challenged conduct itself had a substantial effect on interstate commerce. "If establishing jurisdiction required a showing that the unlawful conduct itself had an effect on interstate commerce,

jurisdiction would be defeated by a demonstration that the alleged restraint failed to have its intended anticompetitive effect. This is not the rule of our cases." *Id.* at 243, 100 S.Ct. at 509. The plaintiff, therefore, must only establish that there exists a sufficient nexus between the challenged activity and interstate commerce so that it can be said " 'as a matter of practical economics' " that there is "a not insubstantial effect on the interstate commerce involved." *Id.* at 246, 100 S.Ct. at 511 (citation omitted).[10]

■ The court has reviewed the plaintiffs' complaint and has determined that the factual allegations contained therein are sufficient to invoke its subject matter jurisdiction under the Sherman Act. The allegations contained in paragraph 16 of the complaint [11] fully satisfy both the "in the flow of commerce" and the "affects commerce" tests. Plaintiffs' activities included repeated interstate purchase of cabs and cab parts, as well as the transportation of interstate travelers. Plaintiffs have clearly satisfied the jurisdictional nexus outlined in *McLain.*

### IV. *Conclusion.*

For the reasons stated above, defendants' motions to dismiss are denied.

**10.** Moreover, the determination of whether an activity has a "substantial effect" on interstate commerce need not be determined with mathematical nicety. In *Goldfarb v. Virginia State Bar,* 421 U.S. 773, 785, 95 S.Ct. 2004, 2012, 44 L.Ed.2d 572 (1975), the Court stated:

"The fact that there was no showing that home buyers were discouraged by the challenged activities does not mean that interstate commerce was not affected. Otherwise, the magnitude of the effect would control, and our cases have shown that, once an effect is shown, no specific magnitude need be proved."

Finally, a lack of intent to affect interstate commerce or the lack of impact on market price does not preclude a viable jurisdictional determination. *See Hospital Building Co. v. Trustees of Rex Hospital,* 425 U.S. 738, 745, 96 S.Ct. 1848, 1852, 48 L.Ed.2d 338 (1976).

**11.** Paragraph 16 of plaintiffs' complaint reads as follows:

"16. The taxicabs licensed by the City including those owned, operated and leased by Yel-

low and Checker substantially affect interstate commerce, are in interstate commerce and are in the stream or flow of interstate commerce in at least the following ways: (a) the taxicabs are manufactured in other states and are transported and sold into Illinois; (b) the taxicabs provide a primary method of transportation to interstate travelers between O'Hare International Airport and the City; (c) the taxicabs also provide transportation to interstate travelers between the City of Chicago and nearby cities in Indiana and Wisconsin; (d) Yellow and Checker taxicabs already in service in other out-of-state cities have been transported back and forth to Chicago from time to time for temporary use here; (e) items in substantial quantities such as gasoline, tires and various replacement parts for the taxicabs originate from outside of Illinois and therefore travel in interstate commerce; (f) substantial insurance and financing for defendants' taxicab business originate from outside Illinois; and (g) employment opportunities as a Chicago taxicab driver have attracted persons originally living outside of Illinois.