823 F.2d 1182
 56 USLW 2098, 1987-1 Trade Cases 67,633
 John H. CAMPBELL, Isadore Head, and Cornelius E. Scott,
individually and on behalf of all others similarly
situated, Plaintiffs-Appellants,
v.
The CITY OF CHICAGO, Yellow Cab Company, and Checker Taxi
Company, Inc., Defendants-Appellees.
 No. 86-2415.
 United States Court of Appeals,
Seventh Circuit.
 Argued June 4, 1987.
Decided July 15, 1987.
 
 Michael T. Hannafan, Michael T. Hannafan & Assoc., Ltd., Chicago, Ill., for plaintiffs-appellants.
 Harold C. Hirshman, Sonnenschein, Carlin, Nath & Rosenthal, Joseph A. Moore, Asst. Corp. Counsel, Judson Minor-Acting Corp. Counsel, Chicago, Ill., for defendants-appellees.
 Before FLAUM and MANION, Circuit Judges, and GORDON, Senior District Judge.*
 FLAUM, Circuit Judge.
 
 
 1
 The plaintiffs sued the City of Chicago ("the City"), Yellow Cab Company ("Yellow"), and Checker Taxi Company ("Checker"), alleging that the defendants had violated Sec. 1 and Sec. 2 of the Sherman Act, 15 U.S.C. Secs. 1 & 2 (1982). The City argued, inter alia, that it was immune from liability under the "state action" exception to the antitrust laws, and the cab companies asserted that they were immune under the Noerr-Pennington doctrine. The district court, in a well-reasoned opinion, agreed with the defendants, and granted their motion for summary judgment. See Campbell v. City of Chicago, 639 F.Supp. 1501 (N.D.Ill.1986). We agree with the district court that the defendants in this case are immune from liability under the antitrust laws, and affirm its judgment.
 
 I.
 
 2
 The facts of this case have been reported several times. See Campbell v. City of Chicago (Campbell II), 639 F.Supp. 1501 (N.D.Ill.1986); Campbell v. City of Chicago (Campbell I), 577 F.Supp. 1166 (N.D.Ill.1983). Briefly stated, the "central focus of this litigation is the City's enactment in 1963 of an ordinance regulating the manner of acquiring and holding taxicab licenses and their number. Chicago Municipal Code, Public Passenger Vehicles Sec. 28-22.1(a) et seq. This ordinance arose out of a settlement among the City and Yellow and Checker over damage claims [by the cab companies] in 1963." Campbell II, 639 F.Supp. at 1502.
 
 
 3
 The plaintiffs allege that the ordinance erected a barrier to entry into the taxicab market.[1] As a result, according to the plaintiffs, Yellow and Checker have been able to charge artificially inflated lease rates for cab licenses to the plaintiffs. The plaintiffs request an injunction to prohibit the City from enforcing the license number limit, and to issue a taxi license to any qualified applicant. Campbell I, 577 F.Supp. at 1171. The plaintiffs also seek damages of $106,802,000, which they request to be trebled, for alleged past cab license rental overcharges. Id.
 
 
 4
 The challenged ordinance, Chicago, Ill., Public Passenger Vehicle Code Sec. 28-22.1, did several things. First, it limited the number of cabs in Chicago to 4,600 (although this ceiling was originally implemented in 1959). In 1963, as in 1987, Checker and Yellow had 80% of the 4,600 licenses. Second, either the Chicago City Council Committee on Local Transportation or a majority of the license holders could request a hearing on whether more licenses were needed. Third, if more licenses were issued, they would have to be issued in proportion to the existing licenses (this is the so-called "percentage guarantee" provision). This meant that Yellow and Checker would receive 80% of any newly issued licenses. Finally, Sec. 28-31.1 provided that if Sec. 28-22.1 were amended, any amended ordinance would have to conform with the above requirements.
 
 
 5
 On April 1, 1987, the Chicago City Council repealed all of ordinance Sec. 28-22.1, except the 4,600 ceiling on the number of cabs. This development moots the plaintiffs' request for an injunction to prevent the City from enforcing the percentage guarantee provision, although not the request to enjoin the 4,600 cab license limit. However, because we conclude that the defendants are immune from liability in this case, we need not reach the merits of the plaintiffs' claims.
 
 II.
 
 6
 The City of Chicago defended this suit on the basis that it was immune from liability under Parker v. Brown, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943). The district court agreed with the City, finding that the City's actions fell within Parker's "state action" exception to the antitrust laws. We agree with the district court, and hold that, in this case, the City is immune from liability.
 
 
 7
 In Parker v. Brown, the Supreme Court, "relying on policies of federalism and state sovereignty, narrowly construed the Sherman Act to exempt a state, acting through its legislature, from antitrust liability arising from anticompetitive conduct," LaSalle National Bank v. Dupage County, 777 F.2d 377, 380 (7th Cir.1985), cert. denied, --- U.S. ----, 106 S.Ct. 2892, 90 L.Ed.2d 979 (1986) (citing Parker, 317 U.S. at 350-52, 63 S.Ct. at 313-14). In City of Lafayette v. Louisiana Power & Light Co., 435 U.S. 389, 98 S.Ct. 1123, 55 L.Ed.2d 364 (1978), the Court refused to extend Parker immunity to municipalities, because municipalities are not themselves sovereign. See id. at 412, 98 S.Ct. at 1136. However, in Town of Hallie v. City of Eau Claire, 471 U.S. 34, 105 S.Ct. 1713, 85 L.Ed.2d 24 (1985), the Court held that a municipality could obtain the exemption, if its challenged conduct was authorized by the state legislature, and if the anticompetitive effects were a foreseeable result of the authorization. See LaSalle National Bank, 777 F.2d at 381 (interpreting Town of Hallie ). The state legislature does not have to explicitly authorize the anticompetitive conduct, see Town of Hallie, 471 U.S. at 42, 105 S.Ct. at 1718, so long as the anticompetitive effects would logically result from the authority to regulate, id.
 
 
 8
 In this case, the City's action in passing the 1963 ordinance was clearly authorized by the State of Illinois. The authorizing statute provides that:
 
 
 9
 The corporate authorities of each municipality may license, tax, and regulate hackmen, dragmen, omnibus drivers, carters, cabmen, porters, expressmen, and all others pursuing like occupations, and may prescribe their compensation.
 
 
 10
 Ill.Ann.Stat. ch. 24, p 11-42-6 (Smith-Hurd 1962). As the district court noted:
 
 
 11
 This provision was enacted as part of a general grant to municipalities of the power to regulate certain, defined areas of commerce in the exercise of their police powers to protect the health and safety of its residents. See generally Ill.Rev.Stat. ch. 24, paragraphs 11-42-1 to 11-42-10 (including regulation of auctioneers, brokers, barbers, ice-cream parlors, detective agencies, bowling alleys, junk yards, pawnbrokers, packing houses, tanneries, blacksmiths and other "unwholesome" businesses).
 
 
 12
 Campbell II, 639 F.Supp. at 1503 (footnote omitted). Moreover, unlike the other sections of the statute that the district court referred to, the section authorizing municipalities to regulate cabmen (among others) expressly authorizes municipalities to "prescribe compensation." Thus, the language in p 11-42-6 clearly authorizes municipalities in Illinois to regulate the number of cab licenses and the conditions under which the licenses are issued.
 
 
 13
 Even if we look beyond the face of the statute, it is clear that the challenged activity was authorized by the legislature. The Illinois Supreme Court has interpreted p 11-42-6, although not in an antitrust situation, to permit the City to regulate the number of cab licenses that may be issued. See Yellow Cab Co. v. City of Chicago, 396 Ill. 388, 397, 71 N.E.2d 652, 657 (1947); see also Campbell II, 639 F.Supp. 1503-04 (discussing Illinois cases that have construed p 11-42-6). These state court decisions do not, of course, decide the issue of the City's immunity under the federal antitrust laws. See Town of Hallie, 471 U.S. at 44 n. 8, 105 S.Ct. at 1719 n. 8. However, these decisions are instructive on the question of whether the state legislature authorized the challenged activity. Thus, the Illinois cases that have determined the legislature's intent in enacting p 11-42-6 further convince us that the City's actions were authorized. Moreover, municipalities in Illinois have the power to regulate taxicabs for the general welfare and the safety of their citizens, see Yellow Cab Co., 396 Ill. at 398, 71 N.E.2d at 657. It is logical that this power would include the ability to regulate the number of taxicabs, because taxicabs present potential safety hazards. Id.[2]
 
 
 14
 Even if the actions taken by the municipality are authorized, the anticompetitive effects of its action must also be foreseeable. LaSalle, 777 F.2d at 381. In this case, we believe that the anticompetitive effects of the ordinance are a foreseeable consequence of the City's action in regulating the taxicab industry. See id. (citing Town of Hallie, 471 U.S. at 41-44, 105 S.Ct. at 1718-19).
 
 
 15
 The fact that the Illinois courts have determined that p 11-42-6 authorizes municipalities to regulate the number of cabs is clearly an important factor in determining that the conduct was foreseeable, and thus immune from antitrust liability. Another factor supporting the foreseeability of the City's action is the fact that, in 1963, the City had been regulating the number of licenses and the conditions of their issuance for over twenty-five years. Therefore, the Illinois legislature had been on notice as to how p 11-42-6 had been implemented by the City. Moreover, the Illinois General Assembly has recently stated, in its "[p]olicy concerning [the] exercise of powers by local governments," that the "[s]tate action exemption to the application of [the] federal antitrust statutes [should] be fully available to all municipalities." Ill.Ann.Stat. ch. 24, p 1-1-10 (Smith-Hurd 1987 Supp.). "Statutes enacted after allegedly anticompetitive conduct [may] express pre-existing state policies to displace competition". California Aviation, Inc. v. City of Santa Monica, 806 F.2d 905, 909 n. 5 (9th Cir.1986) (citations omitted). Therefore, the Illinois General Assembly's passage of p 1-1-10 supports the proposition that the state legislature intended reasonably foreseeable anticompetitive acts from its grant of power to municipalities.
 
 
 16
 Finally, the Illinois General Assembly, by granting municipalities the power to "prescribe compensation" of cab drivers, clearly must have foreseen regulations concerning the number of licenses in a city. If the City could only regulate rates, then it could not fully control the cab drivers' compensation. But, if the City could also regulate the number of cabs, then it could be assured that with the fares it set, and the number of cabs it permitted, all drivers could make a profit. This would enable the City to fully regulate the compensation of cab drivers. We believe that this is the result that the Illinois legislature intended. Therefore, we agree with the district court that the City of Chicago is immune from antitrust liability.[3]
 
 III.
 
 17
 The plaintiffs also argue that the defendant taxi companies are liable under the antitrust laws for conspiring with the City to restrain trade. The cab companies argue that they are immune from liability under the Noerr-Pennington doctrine, which provides that "the antitrust laws do not apply to efforts to persuade the government to organize or support a cartel." Premier Electrical Construction Co. v. National Electrical Contractors Ass'n, 814 F.2d 358, 371 (7th Cir.1987); see United Mine Workers v. Pennington, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965); Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc., 305 U.S. 127, 81 S.Ct. 523, 14 L.Ed.2d 626 (1961). The plaintiffs assert, however, that the cab companies' lobbying efforts in 1963, which secured the passage of the 1963 ordinance, were not legitimate efforts to petition the government as allowed by the Noerr-Pennington doctrine. The plaintiffs argue that the cab companies' actions fall within the so-called "sham exception" to Noerr-Pennington. This exception applies in a situation "in which a publicity campaign, ostensibly directed toward influencing governmental action, is a mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of a competitor and the application of the Sherman Act would be justified." Noerr, 365 U.S. at 144, 81 S.Ct. at 533. We have recently explained the sham exception:
 
 
 18
 [I]t is important to identify the source of the injury to competition. If the injury is caused by persuading the government, then the antitrust laws do not apply to the squelching (Parker v. Brown ) or the persuasion (Noerr-Pennington ). If the injury flows directly from the "petitioning"--if the injury occurs no matter how the government responds to the request for aid--then we have an antitrust case. When private parties help themselves to a reduction in competition, the antitrust laws apply.
 
 
 19
 Premier Electric, 814 F.2d at 376. We agree with the district court that the sham exception does not apply in this case, and that the cab companies are immune from liability under Noerr-Pennington.
 
 
 20
 The plaintiffs' argument, that the private defendants' action fell within the sham exception to Noerr-Pennington, is based on the following facts. In 1963, Mayor Daley and representatives of the cab companies met to discuss how damage claims that the taxicab companies had asserted against the City could be settled. See Campbell II, 639 F.Supp. at 1510. Yellow and Checker had sought damages arising from the City's alleged violation of the 1937 taxi-cab ordinance. Id. The cab companies agreed to drop the damage claims in exchange for a favorable ordinance. As the district court summarized the events:
 
 
 21
 Robert Samuels, President of Yellow Cab, submitted a proposed draft ordinance. A number of small changes were made and the ordinance was sent to the Committee on Local Transportation....
 
 
 22
 The Committee then held public hearings to consider the ordinance. During the hearings, testimony of witnesses revealed the manner in which the ordinance was drafted and the proposed sine qua non to the ordinance (the dropping of the damage claims) was openly discussed.... "Each of the particular provisions was discussed. The provision in the ordinance preventing any amendments was proposed to provide stability to the taxicab industry. The Committee focused on the immediate fare increase and companies argued they needed to remain profitable. A number of changes to the ordinance (not relevant to the present suit) were made and on July 1, 1963 the ordinance was enacted by the full City Council. The damage claims against the city were dropped.
 
 
 23
 Id. at 1510 (citations omitted) (footnote omitted). The plaintiffs conclude that because "what Mayor Daley wanted, Mayor Daley got," no genuine lobbying of the Chicago City Council occurred. Thus, the plaintiffs assert, the defendants' actions fall with the sham exception to Noerr-Pennington.
 
 
 24
 We disagree with the plaintiffs, and conclude that Yellow and Checker's actions are immunized by the Noerr-Pennington doctrine. We believe that the settlement effected in 1963, and the ensuing lobbying efforts in the Chicago City Council, were protected efforts to petition the government. Any injury that the plaintiffs may have suffered stems from the result of the plaintiffs' successful lobbying efforts, Premier Electric, 814 F.2d at 376, rather than from the lobbying itself, id.[4]
 
 IV.
 
 25
 We therefore reject the plaintiffs' challenge to the district court's judgment. The plaintiffs are attempting to impose liability on the defendants under the federal antitrust laws even though the Supreme Court has stated that parties in the defendants' position were not intended to be covered by the antitrust laws. The plaintiffs' remedy lies not in the federal courts, but in influencing the Illinois General Assembly to change the authorizing statute or in convincing the Chicago City Council to change its ordinance.
 
 
 26
 AFFIRMED.
 
 
 
 *
 The Honorable Myron L. Gordon, Senior District Judge for the Eastern District of Wisconsin, is sitting by designation
 
 
 [1]
 The plaintiffs brought this suit on their own behalf and "on behalf of a class consisting of all persons who have held Public Vehicle Chauffeur's licenses issued by the City and who have leased or subleased taxicabs or licenses/medallions alone during the four-year period preceding the filing of the complaint." Campbell, 577 F.Supp. at 1168. Because of our disposition of this case, we need not decide whether the denial of class certification was proper
 
 
 [2]
 The Illinois Supreme Court has stated:
 [T]he right to regulate includes the right to impose reasonable conditions and restrictions and that the power to regulate the use of streets by vehicles included the power to promote the general welfare and prevent accidents, and that the reasonableness of police regulation is not necessarily what is fairly appropriate under all circumstances. Certainly, the City of Chicago ... could, in the exercise of its powers conferred upon it by the legislature, properly determine the number of taxi-cabs which it would permit to be operated in the City of Chicago. Any conclusion other than this would render ineffective the authorizations by the legislature to the City for the regulation of traffic and parking and the policing of the City. It is well known and this court takes judicial notice of the facts that there are numerous congested areas in the City of Chicago and that the very nature of the taxicab business contributes to this traffic congestion.
 Yellow Cab Co., 396 Ill. at 398, 71 N.E.2d at 657.
 
 
 [3]
 In any case concerning the applicability of Town of Hallie, the result will necessarily be closely tied to the facts, because in each case a determination must be made of what the state legislature intended. See, e.g., Hancock Industries v. Schaeffer, 811 F.2d 225 (3d Cir.1987); Sterling Beef Co. v. City of Fort Morgan, 810 F.2d 961 (10th Cir.1987); California Aviation, Inc. v. City of Santa Monica, 806 F.2d 905 (9th Cir.1986); Commuter Transportation Systems, Inc. v. Hillsborough County Aviation Authority, 801 F.2d 1286 (11th Cir.1986); Woolen v. Surtran Taxicabs, Inc., 801 F.2d 159 (5th Cir.1986), cert. denied, --- U.S. ----, 107 S.Ct. 1567, 94 L.Ed.2d 759 (1987); Cine 42nd St. Theater Corp. v. The Nederlander Organization, Inc., 790 F.2d 1032 (2d Cir.1986); Executive Town & Country Services, Inc. v. City of Atlanta, 789 F.2d 1523 (11th Cir.1986)
 
 
 [4]
 The plaintiffs have relied on Flower Cab Co. v. Petitte, 658 F.Supp. 1170 (N.D.Ill.1987). Flower Cab is a case involving the defendant Checker. In Flower Cab, Checker sued the City to force it to permit Checker to assign several of its licenses. In the Flower Cab pleadings, Checker referred to its licenses as "renewable in perpetuity upon the payment of an annual fee." Also, the district court referred to Checker's interest as "durable" and a "protectable property interest." On appeal, the plaintiffs rely on this language to support their propositions that the City could not alter or amend the 1963 ordinance, and that the ordinance granted a perpetual license to the cab companies, thereby creating an illegal monopoly
 We reject such patently frivolous arguments. First, Flower Cab was not an antitrust case. Second, Flower Cab concerned the City's refusal (which the district court found to be unjustified) to assign certain licenses held by Checker. Flower Cab did not address the validity of the challenged ordinances, nor did the Flower Cab court hold, as the plaintiffs contend, that the cab companies have a perpetual right to the licenses. Finally, the plaintiffs' contention that the City has contracted away its regulatory powers is meritless. See Poole v. City of Kankakee, 406 Ill. 521, 536, 94 N.E.2d 416, 424 (1950) ("[W]hile a city has no authority to bargain away its governmental powers it may voluntarily contract within the authority granted by the state."); State Public Utilities Commission ex rel. Quincy Ry. Co. v. City of Quincy, 290 Ill. 360, 362-64, 125 N.E. 374, 375-76 (1919); City of Chicago v. O'Connell, 278 Ill. 591, 606-07, 116 N.E. 210, 214-15 (1917); Contemporary Music Group v. Chicago Park Dist., 57 Ill.App.3d 182, 187, 14 Ill.Dec. 703, 707, 372 N.E.2d 982, 986 (1st Dist.1978) ("The police power may not be contracted away...."); see also Campbell, 639 F.Supp. at 1510 n. 13.