**VICKERY MANOR SERVICE CORPO-RATION, et al., Plaintiffs,**

v.

**VILLAGE OF MUNDELEIN, et al., Defendants.**

**No. 82 C 5392.**

United States District Court, N.D. Illinois, E.D.

Dec. 13, 1983.

Charles Barnhill and George F. Galland, Jr., Chicago, Ill., for plaintiffs.

Charles F. Marino, Chicago, Ill., for defendant Village of Mundelein.

## AMENDED MEMORANDUM OPINION

GRADY, District Judge.

This is an action under § 2 of the Sherman Act; § 3(3) of the Illinois Anti-Trust Act; 42 U.S.C. § 1983; Article I, § 2 of the Illinois Constitution; and for interference with prospective business advantage. Defendants have brought this motion to dismiss, claiming that under *Parker v. Brown*, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943), they are immune from liability for the challenged actions.[1] Because defendants submitted materials outside of the pleadings with their motion, under Rule 12 we must treat this as a motion for summary judgment. However, for purposes of the motion, defendants have not disputed plaintiffs' statement of the facts, which we therefore assume to be true. We deny the motion.

FACTS

Plaintiffs are Vickery Manor Service Corporation ("Vickery Manor") and the legal and beneficial owners of certain land located in the Village of Mundelein (the "Village"). Vickery Manor is a privately-owned public utility company in the business of treating sewage. Vickery Manor is certificated by the Illinois Commerce Commission to provide this service in an area which includes the Village. Defendants are the Village, an Illinois municipal corporation; its administrator and trustees; and its sewage treatment plant operator.

Beginning in 1976 and continuing through 1980, the plaintiff-landowners entered into negotiations with Anden Corporation ("Anden"), a California corporation, for the sale of their land. Anden intended to purchase the land and to develop it for housing. Prior to purchasing the land, Anden met with Village officials in an attempt to ensure that once it bought the land, it would be able to obtain the necessary permits and approvals from the Village to develop it. Vickery Manor was prepared to provide sewage treatment service to the users of this would-be development.

At the meetings between Village officials and Anden, the Village proposed that Anden agree to certain conditions for receiv-

---

1. Defendants' memoranda addressed only the antitrust immunity issue. Therefore, we do not construe the sufficiency of the remainder of the complaint.

ing Village approval for its development plans. Those conditions included: that Anden take over the operation of Vickery Manor; that Anden invest $250,000.00 to upgrade the operations of Vickery Manor; that Anden, after making these expenditures, discontinue Vickery Manor's service to the new development at such time as the Village extended its own service to the proposed development; that Anden pay the Village $3,000.00 per acre to help the Village extend its sewer lines to the proposed development; that Anden pay tap-on fees to the Village at whatever time the Village's sewer lines reached the proposed development and in whatever amounts the Village chose to charge at such time; and that Anden, after dismantling Vickery Manor's service to the new development, continue to have Vickery Manor provide service to a small group of users outside the Village limits, even though such service would be unprofitable for Vickery Manor. Because of the Village's proposed conditions, Anden decided that the development was not economically feasible, and the land sale was never consummated.

Plaintiffs allege also that the Village has taken other action designed to interfere with Vickery Manor's business, including: directing defendant Eaton (the Village's sewage treatment plant operator) to stop working for Vickery Manor; declining to repair the Village water main which provides water to Vickery Manor; and discouraging potential industrial users in and around Vickery Manor's certificated area from using or seeking to use Vickery Manor's services.

Plaintiffs' complaint alleges that the defendants' actions were calculated to put Vickery Manor out of business and to establish the Village's monopoly on sewage treatment service.

## DISCUSSION

### A. *Controlling Case Law*

Defendants argue that their actions are not redressable under the antitrust laws because of the state action doctrine of *Parker v. Brown*, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943), and its progeny. In *Par-*

*ker*, the Supreme Court held that the Sherman Act did not reach actions directed by a state legislature. In *City of Lafayette v. Louisiana Power & Light Co.*, 435 U.S. 389, 98 S.Ct. 1123, 55 L.Ed.2d 364 (1978), a plurality of the Supreme Court held that while municipalities did not enjoy the same exemption from the Sherman Act as did states, municipalities were protected from antitrust liability when they acted "pursuant to state policy to displace competition with regulation or monopoly public service." 435 U.S. at 413, 98 S.Ct. at 1137. That policy need not be spelled out in great detail; the necessary state policy exists "when it is found 'from the authority given a governmental entity to operate in a particular area, that the legislature contemplated the kind of action complained of.'" 435 U.S. at 415, 98 S.Ct. at 1138, *quoting from City of Lafayette, Louisiana v. Louisiana Power & Light Company*, 532 F.2d 431, 434 (5th Cir.1976).

The *City of Lafayette* plurality opinion became the majority rule in *Community Communications Co., Inc. v. City of Boulder, Colorado*, 455 U.S. 40, 102 S.Ct. 835, 70 L.Ed.2d 810 (1982). There the Court added the requirement that to be exempt under the Sherman Act the municipal action must be "in furtherance or implementation of clearly articulated and affirmatively expressed state policy." 455 U.S. at 52, 102 S.Ct. at 841.

### B. *"State Action" Immunity as Applied*

In *City of Lafayette*, the Court did not apply its rule of law to a fact situation but merely affirmed the appeals court's holding that the district court should determine whether the city's actions were directed by the state. In *City of Boulder*, however, the Court did apply the "state action" doctrine. In *City of Boulder*, a cable television company had, pursuant to city ordinance, provided cable service for certain Boulder residents for 14 years. In the late 1970s, when markedly improved technology became available, the company decided to expand its business into other areas of the city and so informed the Boulder city coun-

cil. Although until that time no other company had served the Boulder area, in 1979 a potential competitor also wrote to the council expressing interest in providing cable television service throughout the city. In response, the city enacted an emergency ordinance prohibiting the original company from expanding its business into other areas of the city for three months. The original company filed suit seeking a preliminary injunction to prevent the city from enforcing its ordinance, arguing that the ordinance would violate § 1 of the Sherman Act. The city moved to dismiss, arguing that its authority as a home rule unit of government under the Colorado state constitution gave it all of the powers of the state and thus immunized the ordinance under the *Parker* doctrine.

The city's home rule powers derived from the state constitutional provision giving Boulder "every power theretofore possessed by the legislature ... in local and municipal affairs." 455 U.S. at 52, 102 S.Ct. at 841. The *City of Boulder* Court assumed for the sake of argument that the city's home rule grant did indeed give the city the power to enact the challenged ordinance. But the Court held nonetheless that the city's actions did not enjoy *Parker* immunity. The Court held that "the requirement of 'clear articulation and affirmative expression' is not satisfied when the State's position is one of mere *neutrality* respecting the municipal actions challenged as anticompetitive." 455 U.S. at 55, 102 S.Ct. at 843, emphasis in original. The Court held that the home rule powers did not expressly authorize the city to engage in anticompetitive conduct, and further that the state's neutral position did not satisfy the alternative test where the legislature has contemplated, though not expressly authorized, the kind of action complained of.

■ *City of Boulder* established an important guide for future cases: a general grant of power to a local governmental unit does not necessarily immunize subsequent anticompetitive conduct pursuant to that grant. Thus, as in *City of Boulder*, a municipality's actions may clearly be law-

ful under state law but not lawful under federal antitrust law. 455 U.S. at 52, n. 15, 102 S.Ct. at 841, n. 15. Courts scrutinizing antitrust claims against municipalities therefore should look not at whether the municipality's action was authorized under state law but whether the municipal action was pursuant to a specific legislative intention that competition could be displaced.

Our Court of Appeals has recently applied *City of Boulder* in *Town of Hallie v. City of Eau Claire*, 700 F.2d 376 (7th Cir.1983). There, the City of Eau Claire enjoyed a monopoly in the market for sewage treatment services. Four adjacent townships wished to go into the business of collecting and transporting sewage, but the City of Eau Claire refused to provide treatment services to the towns. Further, the city would provide sewage treatment services to individual landowners in the towns only if they agreed to become annexed by the city and thereby obtain sewage collection and transportation services from the city. The city, contending that its denial of services to the towns was authorized by clearly articulated state policy, argued that state action immunity protected its conduct.

The court first addressed itself to defining the issue. The towns argued that to have immunity the city must have been authorized by the legislature to use its monopoly power over sewage treatment to gain monopolies in sewage collection and transportation. Relying on *City of Lafayette, supra,* the court disagreed, holding that "if we can determine that the state gave the City authority to operate in the area of sewage services and to refuse to provide treatment services, then we can assume that the State contemplated that anticompetitive effects might result from conduct pursuant to that authorization." 700 F.2d at 381, footnote omitted. The court stated, "If the state authorizes certain conduct, we can infer that it condones the anticompetitive effect that is a reasona-

ble or foreseeable consequence of engaging in the authorized activity." *Id.*[2]

Having defined the issue, the court went on to find the requisite legislative authorization for the challenged actions. First, a state statute provided that a city may fix the area in which to extend sewage services and that a city has no obligation to serve beyond that area. Second, the court read another statute and a state court opinion to provide that a city has no obligation to extend its sewage system to areas which refuse to become annexed.

■ Reading *City of Boulder* and *Town of Hallie* together, it is possible to discern unifying principles to guide our case. State action immunity was denied in *City of Boulder* because the general, neutral grant of authority, while very broad, did not evidence any intent of the legislature that the authority could be used to suppress competition. In contrast, state action immunity was upheld in *Town of Hallie* where the legislature's grant of authority included a specific element with a foreseeable anticompetitive effect—the power to refuse to provide services. Although in *Town of Hallie* the legislature had not specifically authorized the anticompetitive result which was challenged in that case, the legislature had specifically authorized municipalities to wield the anticompetitive power which caused the result. Therefore, a general grant of power to operate in a specific area will not suffice (*City of Boulder*), but a general grant of power to operate *anticompetitively* in a certain area will (*Town of Hallie*), assuming that the monopolistic result is one which is "a reasonable or foreseeable consequence of engaging in the authorized activity." *Town of Hallie*, 700 F.2d at 381. In sum, to have "state action" immunity, the legislature must not only give a municipality power to operate in a certain area but must also contemplate that such operation may displace competition. Further, the result of the displaced competition must be one which is a reasonable or foreseeable consequence of the authorized activity.

The Eighth Circuit has recently applied these principles to dismiss a complaint by two privately-run ambulance services against the City of Kansas City. In *Gold Cross Ambulance and Transfer v. City of Kansas City*, 705 F.2d 1005 (8th Cir.1983), the ambulance companies challenged the city's system under which a municipal trust contracted with a single private operator to provide all ambulance service within the city. The court found an affirmatively expressed state policy to displace competition in a Missouri statute which authorized cities to "contract with one or more" ambulance operators. The court held that the legislature, by allowing the city to contract with "one or more" operators, clearly contemplated that a city might contract with only one. The city therefore not only had authority to contract for ambulance service, but had authority to do so anticompetitively. The Missouri statute, like the Wisconsin statute construed in *Town of Hallie*, thus contained a specific contemplation that the powers there granted could be used for anticompetitive purposes.

Also of interest is *Parks v. Watson*, 716 F.2d 646 (9th Cir.1983). There a state statute authorized public ownership of geothermal resources but did not expressly authorize the exclusion of private competition. The city in that case had denied a developer's request to vacate certain plat-

---

**2.** The phrase "certain conduct" used by the Court of Appeals must be read in context. Read too broadly, the phrase could be interpreted as approving a "state action" exemption where the legislature merely authorized municipalities to act in a certain area. Such a rule, however, would be foreclosed by *City of Boulder*. The Court of Appeals' statement, though, follows this sentence: "The district court properly focused on determining if authorization for *the refusal to provide sewage treatment* exists rather than attempting to find a specific authorization for

the monopolizing effect that results from refusing to provide these services." 700 F.2d at 381, emphasis added. Therefore, as discussed *infra, Town of Hallie* stands for the proposition that "state action" immunity can be found where the legislature has authorized certain *anticompetitive* conduct, not merely where the legislature has authorized "certain conduct," 700 F.2d at 381. Any broader reading of the phrase "certain conduct" is not supported by the facts of *Town of Hallie* and would be contrary to *City of Boulder*.

ted city streets unless the developer agreed to dedicate certain land containing geothermal units. The developer sued, charging the city with antitrust violations. The city moved to dismiss, arguing that the state authorization of public ownership envisioned that each local district would constitute a "little monopoly." Denying the city's motion to dismiss, the court stated first that it was "questionable whether the legislature intended to create such monopolistic control," since "nowhere in the statute is there any express authorization to exclude private competition in the geothermal market." 716 F.2d at 663. Then the court held that even if the statute did authorize monopolistic public ownership, the statute did not allow the city "to undertake anticompetitive actions in its efforts to establish such a [monopoly]. We cannot say that there is a 'clearly articulated and affirmatively expressed' state policy that there be no competition in the geothermal heat market prior to the formation of such city-run geothermal heating districts." *Id.* at 664. This holding is in line with the Seventh Circuit's rule in *Town of Hallie* that even if a statute contemplates certain anticompetitive conduct, other conduct in furtherance of the authorized conduct is not immune unless it "is a reasonable or foreseeable consequence of engaging in the authorized activity." 700 F.2d at 381, footnote omitted.

We further note an opinion of Judge Decker of our district in *Campbell v. The City of Chicago,* 577 F.Supp. 1166 (N.D.Ill. 1983). In *Campbell,* the city in 1963 had enacted an ordinance authorizing the issuance of 4,600 taxicab licenses, 2,666 of which are held by Yellow Cab Company and 1,500 of which are held by Checker Cab Company. The ordinance also provided that the City Council, "at the request of the holders of a majority of the licenses at any time outstanding[,]" shall within 60 days after such request "hold hearings ... to determine whether public convenience and necessity may require additional taxicab service." *Campbell,* at 1169. The ordinance further provided that new licenses, if issued at all, must be issued to holders of

present licenses in proportion to the number they now retain. The ordinance had been enacted in return for a promise from Yellow Cab Company and Checker Cab Company to drop lawsuits then pending against the city.

The city argued that this ordinance was immune from antitrust liability under *Parker* by virtue of a state statute which provided: "The corporate authorities of each municipality may license, tax, and regulate hackmen, draymen, omnibus drivers, carters, cabmen, porters, expressmen, and all others pursuing like occupations, and may prescribe their compensation." Ill.Rev. Stat. ch. 24, § 11–42–6. However, Judge Decker held that this statute did not constitute a clearly articulated and affirmatively expressed policy to displace competition. First, he held, "[t]he statute at issue in this case authorizes the licensing and regulation of taxicabs, but it nowhere sanctions the creation of a set of private rights that are perpetually binding on the City." *Ibid.* at 1174. In addition to the statute's not expressly authorizing the challenged ordinance, Judge Decker held that such an intent to displace competition could not be read into the statute: "The anticompetitive effects which allegedly resulted from this creation of private rights perpetually binding on the City cannot logically be viewed as a 'necessary or reasonable consequence of engaging in the authorized activity.'" *Id., quoting from* Areeda, *Antitrust Immunity for "State Action" After Lafayette,* 95 Harv.L.Rev. 435, 446 (1981). Judge Decker also held that Illinois court decisions upholding the city's taxicab ordinance either were distinguishable or not relevant, since none dealt directly with the question whether it was an antitrust violation to restrict the number of taxicab licenses. Judge Decker cited *City of Boulder*'s holding that while a municipal activity may be permissible under state law, whether it is an antitrust violation is a matter of federal law. *City of Boulder,* 455 U.S. at 52 n. 15, 102 S.Ct. at 841 n. 15.

Finally, a recent opinion of the Eighth Circuit departs from the fairly consistent analysis of the cases discussed above. In *Central Iowa Refuse Systems, Inc. v. Des Moines Metropolitan Solid Waste Agency*, 715 F.2d 419 (8th Cir.1983), a municipal consortium formed pursuant to state law constructed and operated a solid waste disposal site. The consortium, pursuant to its authorizing statute, issued revenue bonds to fund construction of the site. In the bond contract, the consortium pledged to require participating municipalities to refuse to grant any license to a competing facility. A privately-owned waste disposal concern brought suit, claiming that this exclusivity provision violated the federal and state antitrust laws. The court, while conceding that the authorizing statute did not expressly reflect that the legislature contemplated the displacement of competition, nevertheless inferred the requisite intent from three factors. First, the court noted that the legislature had placed extremely high priority on the activities of intergovernmental agencies engaged in the disposal of solid waste, and concluded from this that the legislature must have wished that such agencies be able to do whatever was necessary to ensure the success of their activities. Second, the court stated that the legislature, by affirmatively addressing the subject matter of waste disposal and providing a wide range of options for dealing with the subject, went beyond the "mere neutrality" found by the Supreme Court in the home rule grant in *City of Boulder*. Third, the court found that the legislature, by authorizing revenue bond financing, must have intended that the authorities issuing such bonds would have the latitude necessary to promote the bonds' sale; according to the court, if the bonds could not otherwise be marketed, restricting competition was a "necessary or reasonable consequence" of engaging in the authorized activity.

We believe the court's analysis in *Central Iowa Refuse Systems* is open to question. With regard to the first factor noted above, we do not believe that the priority a legislature places on an authorized activity necessarily bears any relation to whether the legislature intended that the authority could be used anticompetitively. First, such an analysis would require federal courts to speculate as to whether a state legislature intended one program or another to have high or low priority—something this court would be hesitant to do. Second, even if we could conclude that the legislature intended a particular program to have a high priority, we would not necessarily conclude that such priority carried with it the implied authority to do "whatever is necessary" to make the program successful. Third, we do not agree that an implied "whatever is necessary" authorization is a clearly articulated and affirmatively expressed legislative intention to permit the displacement of competition. The result in *City of Boulder* certainly would argue against adopting such a rule.

With regard to the second factor relied on by the court in *Central Iowa Refuse Systems*, we question whether the court's conclusion is supported by *City of Boulder*. We do not believe that there is a relevant distinction between the "mere neutrality" found in Colorado's home rule authority and the "wide range of options" found in the Iowa statute. No other court has held that merely by affirmatively addressing a subject and providing municipalities with a wide range of options in dealing with the subject matter, a legislature has clearly articulated and affirmatively expressed an intention to permit the displacement of competition. To do so would be to abdicate the court's responsibility to search for a legislative intent to displace competition in any case where the state legislature has passed a bare-boned authorizing statute and turned the municipality free to use the powers as it pleases. Surely *City of Boulder* requires that the legislature have done more than that before a district court can find the requisite clearly articulated and affirmatively expressed state policy to permit the displacement of competition.

These same considerations also cast doubt on the third factor relied on by the court in *Central Iowa Refuse Systems*.

We do not agree that the legislature's authorization of the issuance of revenue bonds necessarily gives an issuing authority the right to use the bond contract as a method of restricting competition. In this regard, we note that the statute, as is usually the case with revenue bond authorizing statutes, authorized issuers to set rates, fees and charges sufficient to guarantee the viability of the financed project. Therefore, there is little if any reason to conclude that the legislature contemplated that an issuer could take other, anticompetitive actions to assure the viability of the financed project.

### C. Applying Decided Cases to Our Facts

With these legal principles and specific holdings in mind, we now turn to an examination of the facts of our case.

Defendants argue that their actions were taken in furtherance of clearly articulated and affirmatively expressed state policy and thus are entitled to "state action" immunity under *Parker* and its progeny. At oral argument and in their briefs, defendants identified a number of statutes which they believe support their position. We consider these statutes in turn.[3]

First, a number of statutes authorize municipal activity in the sewage field. Ill.Rev. Stat. ch. 24, § 11–137–1 provides that "each municipality may contract with any person for ... sewerage for drainage and sanitary purposes of the municipality." Section 11–137–2 provides that "[i]n all municipalities where any person has constructed a ... sewerage system ... the municipality may purchase or lease that ... system ... from the owners thereof ...." Section 11–139–2 provides that "[a]ny municipality may acquire, or construct, and maintain and operate a combined waterworks and sewerage system," and § 11–139–8 provides that a municipality may "make, enact, and enforce all needful rules and regulations for the acquisition, construction, extension, improvement, management, and

maintenance" of such a system. Section 11–141–2 provides that "[e]very municipality may construct or acquire, and may improve, extend, and operate a sewerage system either within or without the corporate limits thereof."

Defendants also point to Ill.Rev.Stat. ch. 24, §§ 11–80–2, 3, 7, 8, 13 and 14, which give municipalities certain authority to regulate their streets. Those sections provide: "The corporate authorities may regulate the use of their streets and other municipal property," Ill.Rev. ch. 24, § 11–80–2; "[t]he corporate authorities of each municipality may prevent and remove encroachments or obstructions upon the streets and other municipal property," Ill.Rev.Stat. ch. 24, § 11–80–3; "[t]he corporate authorities of each municipality may regulate the openings in streets and other municipal property for the laying, building, repairing, and removing of gas or water mains and pipes, or sewers, tunnels, and drains and may erect gas lights," Ill.Rev.Stat. ch. 24, § 11–80–7; "[t]he corporate authorities of each municipality may regulate the use of the space over the streets, alleys, other municipal property, and public places of the city ...," Ill.Rev.Stat. ch. 24, § 11–80–8; "[t]he corporate authorities of each municipality may regulate the use of sidewalks, the construction, repair, and use of openings in sidewalks, and all vaults and structures thereon and thereunder ...," Ill.Rev. Stat. ch. 24, § 11–80–13; and "[t]he corporate authorities of each municipality may regulate and prevent the use of streets, sidewalks, and public property for signs, sign posts, awning posts, telegraph poles, watering places, racks, posting handbills and advertisements," Ill.Rev.Stat. ch. 24, § 11–80–14.

#### (1) Express Authorization

As have other courts, we first inquire whether these statutes provide express authorization for the kind of activities alleged to have been carried out by defendants

---

**3.** One statute cited by defendants, Ill.Rev.Stat. ch. 24, § 11–117–1, is not applicable here because § 11–117–2, which defines what is a "public utility" for purposes of § 11–117–1, does not include sewage systems.

here. We hold that they do not. Unlike *Town of Hallie, supra*, where a statute expressly stated that the city had no obligation to provide sewage treatment services beyond its geographical borders, and *Gold Cross Ambulance, supra*, where the statute expressly authorized the city to contract with "one or more" operators, the statutes here make no mention whatsoever of monopoly power for municipalities. Rather, as in *City of Boulder*, the statutes here are merely neutral grants of power. "[P]lainly the requirement of 'clear articulation and affirmative expression' is not satisfied when the State's position is one of mere *neutrality* respecting the municipal actions challenged as anticompetitive." *City of Boulder, supra*, 455 U.S. at 55, 102 S.Ct. at 843, emphasis in original. *See also Parks v. Watson, supra* (where statute merely provided for the option of public utility ownership, it was "questionable whether the legislature intended to create such monopolistic control," since "nowhere in the statute is there any express authorization to exclude private competition in the geothermal market." 716 F.2d at 663). *Accord, Campbell v. The City of Chicago, supra* (statute authorizing city to regulate taxicabs did not expressly sanction anticompetitive conduct by the city). To qualify for the "state action" exemption, the municipal action must not merely be lawful under state law but must be pursuant to a legislative intent to permit the displacement of competition. These statutes evidence no such intention in their express language.[4]

### (2) Implied Authorization

■ The harder question is whether, though not expressly stated, these statutes nevertheless manifest an intent by the legislature to displace competition in the market for sewage disposal. As has been noted previously, a municipality does not necessarily have to "be able to point to a specific, detailed legislative authorization before it may properly assert a *Parker* defense to an antitrust suit"; rather, an adequate legislative basis exists when it is found "from the authority given a city to operate in a particular area that the legislature contemplated the kind of action complained of." *City of LaFayette, supra*, 435 U.S. at 415, 98 S.Ct. at 1138.

Defendants argue that in addition to the specific statutory powers enumerated above, municipal corporations have inherent powers to attach conditions to the franchises which privately-owned public utilities must have in order to operate within the Village. Therefore, defendants argue, the legislature, in authorizing municipalities to own utilities, to make rules and regulations to safeguard them, and to regulate the use of the streets, must have envisioned that municipalities would be permitted to use that power to restrain competition in the sewage disposal field. We disagree.

Defendants' argument stems from certain court decisions which purport to recognize a municipality's right to impose conditions on franchisees. Defendants' principal case is *City of Geneseo v. Illinois Northern Utilities Co.*, 378 Ill. 506, 39 N.E.2d 26 (1941), *cert. denied*, 316 U.S. 670, 62 S.Ct. 1046, 86 L.Ed. 1746 (1942). There the court held that a municipality's power to regulate the use of its streets allowed it to refuse to renew a utility's expired franchise. We do not find this case helpful to defendants. First, as in *City of Boulder*, a court's interpretation of general statutory authority does not meet the requirement that the legislative policy be clearly articulated and affirmatively expressed. Second, even if we were to give *City of Geneseo* greater weight, the opinion only holds that munici-

---

**4.** The Illinois legislature does know how to authorize expressly a governmental unit to attach conditions to its contracts. *See* Ill.Rev.Stat. ch. 24, § 11–117–6, which provides, in relevant part: Any municipality may incorporate in any grant to a public utility company reservation of the right on the part of the municipality to take over all or any part of the property, plant, or equipment used in the operation of that public utility company, at or before the expiration of the grant, upon such terms and conditions as may be provided in the grant. However, as noted in footnote 3, *supra*, sewage systems are not among the defined "public utilities" to which this provision applies.

palities have certain powers; the opinion does not hold that such powers may be used anticompetitively or indeed even consider any antitrust implications. We must again recall the distinction, for purposes of "state action" immunity, between a municipality's general power to enact a law and a municipality's authority to use that power anticompetitively. Third, even if *City of Geneseo* were read to give municipalities authority to use their franchise powers anticompetitively (the right to refuse to renew a utility's franchise could be read to encompass anticompetitive conduct and results), *City of Geneseo* still would not authorize the conduct alleged in the complaint here. Defendants are not alleged to have refused to grant Vickery Manor a franchise; they are alleged to have attempted to exact onerous conditions from Vickery Manor. "[E]ven a lawful monopolist may be subject to antitrust restraints when it seeks to extend or exploit its monopoly in a manner not contemplated by its authorization." *City of Lafayette, supra,* 435 U.S. at 417, 98 S.Ct. at 1138. This case is similar to *Parks, supra,* where the court held that even if the municipality were authorized eventually to have a monopoly, that authority did not allow the municipality to wield monopoly power in achieving the monopoly.

Defendants have also cited cases which they say stand for the proposition that a municipality's franchise powers include the right to attach any conditions, however onerous, to the franchise. *See General Electric Cablevision v. City of Peoria,* 8 Ill. App.3d 948, 291 N.E.2d 295 (3d Dist.1972); *Illinois Broadcasting Co. v. City of Decatur,* 96 Ill.App.2d 454, 238 N.E.2d 261 (4th Dist.1968). First, for the reasons discussed in connection with the *City of Geneseo* case, we give little weight to these court opinions for purposes of the present inquiry. Aside from that, these cases hold only that a franchise agreement, once entered into by a municipality and a utility, are binding. A municipality may have the

right to enforce conditions which have been accepted by a franchisee; but this does not give a municipality the right to insist on onerous restrictions as a condition to granting the franchise in the first place. Further, as stated in *Illinois Broadcasting Co.,* a municipality does not have the right to impose—and a franchisee cannot agree to—conditions that are against public policy. 96 Ill.App.2d at 462, 238 N.E.2d at 265.[5] Since anticompetitive actions by a municipality are against public policy unless taken pursuant to a clearly articulated and affirmatively expressed state policy to permit the displacement of competition, defendants' cases, far from answering the question whether such a policy exists here, only lead us back to the original question.

■ In sum, we hold that the authority of a municipality to own sewage systems, to regulate its streets, and to deny franchises does not constitute a clearly articulated and affirmatively expressed state policy authorizing the anticompetitive actions challenged here. Defendants are alleged to have gone far beyond merely owning their own sewage system, regulating their streets or denying a franchise: the complaint sets out a systematic attempt to use monopoly power to extract onerous and potentially ruinous conditions from Anden Corporation, which was not even a public utility but rather a land developer. The Village's actions were neither expressly authorized by state statute nor a reasonable or foreseeable use of the expressly granted powers.

Our conclusion is bolstered by the statutory scheme under which utilities operate in Illinois. Privately-owned utilities are regulated by the Illinois Commerce Commission pursuant to an elaborate statutory scheme. *See* Ill.Rev.Stat. ch. 111⅔, § 1 *et seq.* Municipalities retain certain limited regulatory powers over privately-owned public utilities, such as the power to control the use of the streets discussed in *City of*

---

5. Plaintiffs' memoranda cites additional cases which refute the argument that a municipality's franchise powers give it the right to insist on any and all conditions to a franchise. *See* Plaintiff's Brief on the Issues Raised by the Court, at 10–13.

*Geneseo.* However, with respect to other powers, the legislature provided for joint regulation of a privately-owned public utility by the Commerce Commission and the host municipality only in situations where the host municipality opted for such joint regulation by referendum. *See* Ill.Rev. Stat. ch. 111⅔, §§ 85, 89.[6] According to plaintiffs, the Village never adopted such a referendum. In our view, therefore, this statutory scheme evidences a legislative intent not that municipalities could act anti-competitively with respect to privately-owned public utilities, as defendants argue, but rather that municipalities would have limited regulatory powers and the Commerce Commission would have primary responsibility for such regulation. Further, even where a municipality itself has entered the sewage disposal business, state law seems to envision that the municipality would be competing with privately-owned public utilities—not driving them out of business. *People v. Village of Buffalo Grove,* 85 Ill.App.2d 382, 229 N.E.2d 401 (1st Dist.1967). Therefore, far from the legislature clearly articulating and affirmatively expressing a state policy to allow municipalities to wield monopoly power over privately-owned public sewage utilities, the legislature has afforded municipalities a much more limited role. Under the circumstances, we must hold that the legislature neither expressly authorized nor "contemplated the kind of action complained of." *City of Lafayette,* 435 U.S. at 415, 98 S.Ct. at 1138.[7]

**6.** Even this limited authority in a municipality to regulate privately-owned public utilities within their borders has now been eliminated. *See* P.A. 82–583, 82d General Assembly, 1st Sess. (1981). However, since the effective date of this repeal falls after the events which are the subject of this action, we have not accorded the repeal any weight in considering this motion.

**7.** Even were we to follow *Central Iowa Refuse System*'s more liberal interpretation of *City of Boulder,* we still would not find the requisite legislative intent to permit the displacement of competition in our case. The most that could be concluded by following *Central Iowa Refuse System* in our case is that the legislature authorized municipalities to restrict competition in the sewage treatment field. That would still not

Finally, we note a statute passed very recently by the Illinois General Assembly, P.A. 83–929. That statute clearly articulates and affirmatively expresses the legislature's policy to allow what appears to be almost every unit of local government in Illinois an exemption from the federal antitrust laws. The statute provides that whatever constitutional and statutory powers may be possessed by home rule units, non-home rule municipalities, counties, sanitary districts, the Regional Transportation Authority, public school districts and townships, those powers may be exercised notwithstanding effects on competition. We are not presented here with the question of the validity of such a broad-sweeping statute, since the statute was not in effect at the time of the acts which are the subject of the complaint here. However, the passage of this statute reinforces our analysis in that it highlights the difference between the legislature's merely authorizing a unit of government to exercise certain power and the legislature's authorizing that power to be used anticompetitively. To the extent that the legislature saw the need to pass P.A. 83–929, it could be argued that the legislature had not previously clearly articulated and affirmatively expressed an intention that units of government could act anticompetitively.

CONCLUSION

For the reasons stated herein, defendants' motion to dismiss is denied.[8]

be a sufficient authorization for the acts alleged here, since those acts are not a "reasonable or foreseeable consequence of engaging in the authorized activity," *Town of Hallie, supra,* 700 F.2d at 381, footnote omitted, but are considerably more onerous.

**8.** The court notes that counsel on both sides of this case have been especially helpful in the resolution of the issues raised. Counsel filed memoranda when the motion was originally filed; argued the motion orally; filed supplemental memoranda addressing recently-decided cases; and filed cross memoranda on further issues raised by the court. These papers and arguments were unusually helpful and responsive.